**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

In re:

GREGORY B. MYERS,

      Debtor.

_____/

BRIAN KING, *et al.*,

      Plaintiffs,

      v.

ROGER SCHLOSSBERG, Trustee,

      Defendant.

_____/

Case No.  15-26033-MCR
(Chapter 7)

Adv. No. 24-00007

NOTICE OF FILING,

DEBTOR, GREGORY B. MYERS HEREBY FILES
IN THE RECORD OF THIS CASE A COPY
OF THE JANUARY 3, 2023 "COURT
TRIAL" TRANSCRIPT IN CIVIL No. 436977V,
A COPY OF WHICH IS ATTACHED THERETO
AS EXHIBIT "A".

147

Gregory B. Myers, *pro se*
700 Gulf Shore Blvd. N.
Naples, Florida 34102
(301) 325-2312
gregbmyers@verizon.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 30, 2025, a copy of the foregoing was furnished to the following parties:

Roger Schlossberg
Frank J. Mastro
P.O. Box 2017
Hagerstown, MD 21742-2017

Maurice B. VerStandig, Esq.
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy., Suite 665
Henderson, NV 89012

Gregory B. Myers, *pro se*

EXHIBIT "A"

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

```
----------------------------X
                            :
BRIAN KING, ET AL.,         :
                            :
          Plaintiffs,       :
                            :
               v.           :        Civil No. 436977V
                            :
SERV TRUST, ET AL.,         :
                            :
          Defendants.       :
                            :
----------------------------X
```

COURT TRIAL

Rockville, Maryland                          January 3, 2023



IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

```
------------------------------X
                              :
BRIAN KING, ET AL.,           :
                              :
        Plaintiffs,           :
                              :
              v.              :        Civil No. 436977V
                              :
SERV TRUST, ET AL.,           :
                              :
        Defendants.           :
                              :
------------------------------X
```

Rockville, Maryland

January 3, 2023

WHEREUPON, the proceedings in the above-entitled matter commenced

BEFORE:   THE HONORABLE DAVID LEASE, JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:

MAURICE VERSTANDIG, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road, Suite 114-160
Potomac, Maryland 20854

FOR DEFENDANT 6789 GOLDSBORO, LLC:

ERIC PELLETIER, Esq.
FRANCES WILBURN, Esq.
Offit Kurman, P.A.
7501 Wisconsin Avenue, Suite 1000W
Bethesda, Maryland 20814

FOR DEFENDANT SCHLOSSBERG:

FRANK MASTRO, Esq.
Schlossberg, Mastro & Scanlan
P.O. Box 2067
Hagerstown, Maryland 21742

I N D E X

                                                          Page

Judge's Ruling                                              20

Opening Statements:

     Maurice VerStandig, Esq.                               22
     For the Plaintiffs

     Eric Pelletier, Esq.                                   30
     For the Defendants


| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Plaintiffs: | | | | |
| Brian King | 36 | 65 | 81 | -- |
| Frances Wilburn | 86 | -- | -- | -- |
| For the Defendants: | | | | |
| (None) | | | | |


| EXHIBITS | MARKED | RECEIVED |
|---|---|---|
| For the Plaintiffs: | | |
| Exhibit Nos. 1-22 | -- | 35 |
| Exhibit No. 23 | -- | 74 |
| Exhibit No. 24 | -- | 70 |
| Exhibit No. 25 | -- | 78 |
| Exhibit No. 26 | -- | 85 |
| Exhibit No. 27 | -- | 85 |
| For the Defendants: | | |
| (None) | | |



I N D E X  (cont.)

                                                      Page

Closing Arguments (cont.):

        Maurice VerStandig, Esq.                       94
        For the Plaintiffs

        Eric Pelletier, Esq.                          109
        For the Defendants

        Frank Mastro, Esq.                            115
        For the Defendants


Judge's Ruling                                        125

e)cribers
www.escribers.net | 800-257-0885

5

1                      P R O C E E D I N G S

2              THE COURT:  All right.  Good morning, everyone.

3              MR. VERSTANDIG: Good morning.

4              THE COURT:  Please be seated.

5              THE CLERK:  Calling Case No. 436977V, Brian King, et

6    al. v. Serv Trust, et al.

7              MR. VERSTANDIG:  Good morning, Your Honor.  Maurice

8    VerStandig appearing on behalf of Brian King, Christina King,

9    and the Christina and Brian King Children's Trust.

10             THE COURT:  All right.

11             MR. VERSTANDIG:  And I'm joined by Brian King, who is

12   seated to my left.

13             THE COURT:  All right.  Good morning.

14             MR. PELLETIER:  Good morning, Your Honor.  Eric

15   Pelletier here for 6789 Goldsboro, LLC.

16             MS. WILBURN:  Good morning, Your Honor.  Frannie

17   Wilburn on behalf of the 6789 Goldsboro, LLC.

18             THE COURT:  All right.  Good morning.

19             MR. MASTRO:  Good morning, Your Honor.  Frank Mastro

20   on behalf of nominal defendant, Roger Schlossberg.  He's the

21   Chapter 7 trustee of the bankruptcy estate of Greg Myers.

22             THE COURT:  Okay.  All right.

23             MR. VERSTANDIG:  Your Honor, a preliminary matter.

24             THE COURT:  Yes.

25             MS. VERSTANDIG:  There are, and I don't mean this to

6

1  become a side opening, but there are essentially four issues

2  that would be triable today.

3          THE COURT:  Okay.

4          MR. VERSTANDIG:  All of the attorneys in this

5  courtroom concur that if my clients succeed on the first issue,

6  which is an action for declaratory judgment with an entity

7  known as Serv Trust as the alter ego of Gregory Brian Myers,

8  that with due respect and deference, you would be without

9  jurisdiction to hear the other three matters.  And we would not

10  bother you again with them.  We would take them to the U.S.

11  Bankruptcy Court to the District of Maryland and permit Judge

12  Ruark to sift through them.

13          THE COURT:  Okay.

14          MR. VERSTANDIG:  Because --

15          THE COURT:  Now the question I had about that,

16  because I saw your memo this morning on the alter ego, and the

17  two things was one is the order of abstention from the United

18  States Bankruptcy Court was dated, I think, January 30th of

19  2019.  But your amended complaint alleging the alter ego was

20  not filed until February 11th of 2019.  So my question is, I

21  don't see how -- I'm not sure how the order of abstention from

22  the United States Bankruptcy Court encompasses the alter ego

23  claim since it was not a claim in existence at the time of the

24  abstention order from the Bankruptcy Court.

25          MR. VERSTANDIG:  Yes, Your Honor.  I can address that

7

1   fairly simply, fortunately.  We had originally filed the alter

2   ego claim as a standalone adversarial proceeding in the United

3   States Bankruptcy Court.

4           THE COURT:  Okay.

5           MR. VERSTANDIG:  Which is what begat the order of

6   abstention.  After the order of abstention where the court

7   indicated, and obviously I paraphrase, that this action was

8   already pending.  At the time it was just a declaratory

9   judgment for redemption of the membership interest and some

10  issues related.  I will periodically today make reference to

11  issues related to claims against Mr. Myers solely for the

12  record.  I want it to be clear, as I know everyone is, we are

13  not pursuing any claims against Mr. Myers individually today.

14  And any contextual references I make are merely for context.

15          But because this matter was already pending, once the

16  Bankruptcy Court abstained, which had the effect of closing

17  out --

18          THE COURT:  Right.

19          MR. VERSTANDIG:  -- that precise cause of action in

20  that court, we then amended and brought it here.

21          THE COURT:  Okay.  All right.  See, I don't have all

22  the bankruptcy filings, but I did get the order of abstention.

23  The other question I had is under, it's sort of a hybrid under

24  the Frow doctrine, which is that when you have claim against

25  one party, in essence are they in default or not.  We can

8

1  debate whether they are or not in default.  But under that

2  doctrine is where somebody would have potential joint liability

3  or liability based upon the defaulting party's liability.

4        And under the Frow doctrine, you can either one of

5  two things.  You sort of abstain from going forward because you

6  don't want to try it twice.  Or two, you can enter the

7  judgment, but then it's a nonfinal judgment because anything

8  that I do today in essence necessarily would be nonfinal

9  because we're not putting all of the claims against all the

10  parties for not getting to an adjudication.  So we don't have a

11  final judgment today under any circumstance.  Now there's

12  mechanisms by which you can request a final judgment be

13  entered, and this may be an appropriate case, it may not be, I

14  don't know.  But that's up to -- and then the Appellant Courts

15  often times second guess, and I've seen us reversed more times

16  than not by certifying the final judgment when in fact the

17  Special Appeals says you really shouldn't do that because you

18  don't want piecemeal litigation.  So I'm trying to sort of

19  figure out how I deal with that.

20        And then the other issue that I had a concern about

21  was the alter ego claim.  Seems to be the one that would be

22  most closely aligned with potential liability for Mr. King in

23  the sense that, I think under paragraph 80 of your finding --

24  or of your amended complaint, you state that "his expenditures

25  of monies belonging to Serv Trust is a form pattern habit of

1  gross breach of his fiduciary duties as trustee."  Which would

2  in essence mean that I'd have to make a finding that he

3  breached his duties as a trustee, which could potentially be --

4  the concern would be used in a claim by any beneficiary of the

5  trust to say he breached his fiduciary duties to me, so.

6        MR. VERSTANDIG:  So Your Honor, I think I can address

7  that in two parts.  And if it's okay with you, I'll take the

8  latter --

9        THE COURT:  Okay.  Sure.

10        MR. VERSTANDIG:  -- first and the former second.  The

11  existence of parallel bankruptcy estates creates some

12  admittedly bizarre legal constructs.

13        THE COURT:  Yes.  I don't even know how that's

14  possible.  I don't know how there's still a bankruptcy.  I was

15  looking to see that the Florida bankruptcy would have ceded to

16  the Maryland bankruptcy that's still pending from what I see.

17        MR. VERSTANDIG:  There are two --

18        THE COURT:  I mean, I first thought that Maryland had

19  been just closed out and that his discharge was disallowed and

20  was closed.  And then you would've had the second bankruptcy in

21  Florida where I guess Mr. King now purportedly resides.

22        MR. VERSTANDIG:  So I'm actually normally a

23  bankruptcy attorney, and without geeking out on eccentricities

24  of circuit splits --

25        THE COURT:  I did my fair number of adversarial

10

1  proceedings, but I never was a bankruptcy guy.  I didn't do

2  like -- I would only litigate in adversary proceedings.

3         MR. VERSTANDIG:  There is a two-estate doctrine.

4  Obviously without litigating in front of you or it belonged to

5  the courts, I would respectfully suggest that in many courts in

6  many circuits, the second case probably would've been properly

7  dismissed.  That's obviously not what happened.

8         THE COURT:  Right.  Okay.

9         MR. VERSTANDIG:  But I think the posture of the two

10  cases will answer your second question.  The Chapter 7 case in

11  Maryland was filed as a Chapter 11 case and then converted to

12  Chapter 7.  All of that happened before the Chapter 13 case was

13  filed in Florida.

14         THE COURT:  Right.

15         MR. VERSTANDIG:  Which means that on the date that

16  the Chapter 11 relief was entered, and then on the date of

17  conversion to Chapter 7, a unitary estate was created.  And

18  upon conversion of Chapter 7, that unitary estate vested in Mr.

19  Schlossberg as Mr. Myers' bankruptcy trustee.  At no point

20  since is there any contention that Mr. Schlossberg has

21  abandoned or otherwise disposed of the assets of that estate.

22  So when Mr. Myers then went down and filed in Florida several

23  years later, he had not regained legal or equitable --

24         THE COURT:  I read your argument.

25         MR. VERSTANDIG:  Yes.

11

1          THE COURT:  So I understand it, I just -- it's one of
2    those -- I hate having one side of an argument, so.
3          MR. VERSTANDIG:  I appreciate.
4          THE COURT:  Yes.
5          MR. VERSTANDIG:  Look, it's eccentric.  I'm happy to
6    recognize that.  But I would say that because of that, any
7    claims against Mr. Myers that are related to the findings that
8    may or may not be reached today would necessarily be
9    jurisdictionally vested in the Maryland Bankruptcy Court, which
10   is the court that has issued the order of abstention.  I would
11   also say to whatever extent there are any reservations about
12   the Florida bankruptcy court's cognizance of what we plan to do
13   today, the exercise that was carried out over the past 96 hours
14   where this matter --
15         THE COURT:  I'm going to just tell you, I just got an
16   email from -- my chambers just got an email from Mr. Myers.
17   It's purported copied to you all.  I don't know if you saw it.
18   But it's an email from 9:37, so I doubt you've seen it since
19   you've been talking to me.  He says that in response to the two
20   orders of remand by the United States Bankruptcy Court for the
21   Middle District of Florida a short time ago, he claims they're
22   not final and that both orders were appealed to the United
23   States District Court for the Middle District of Florida, part
24   of 9:38 a.m. on January 3, 2023.  So he said he has now
25   appealed the remand.

1          MR. VERSTANDIG:  Your Honor, without litigating in

2   front of you issues that I imagine I won't end up litigating in

3   Tampa, Florida, where I --

4          THE COURT:  I understand.  I'm just concerned now if

5   it's a nonfinal, is the remand stayed.  I mean, that's what I'm

6   trying to figure out.

7          MR. VERSTANDIG:  So I would argue no for two reasons.

8   One, I think the punitive nonfinality is actually belied by,

9   and obviously I haven't seen the email, I just --

10          THE COURT:  No.

11          MR. VERSTANDIG:  -- know what you shared with us, but

12   it's belied by the appeal.  I'm not sure how Mr. Myers could

13   appeal a nonfinal order without leave of the trial court, in

14   this case being the U.S. Bankruptcy Court for the Middle

15   District of Florida.  And two, looking at the motion for remand

16   and the orders that were entered in the two matters early this

17   morning by the Florida Bankruptcy Court, I would argue it is

18   contextually quite evident that the Florida Bankruptcy Court

19   intends for us to proceed.  And the reason we requested

20   emergency relief, and a point in fact is we were able to get a

21   ruling on an emergency motion without so much as a single

22   business hour elapsing between when the emergency remand was

23   requested and when the order was handed down, is because the

24   exigency created by everyone's intent to move forward in your

25   court today.

1          THE COURT:  Right.

2          MR. VERSTANDIG:  I would also say in terms of the

3    nonfinality of any order, there's probably two means through

4    which that can be addressed.  And I'll huddle with counsel.  I

5    don't want to put the cart in front of the horse.  We would

6    probably do so shortly after you ruled.  The two cognizable

7    means that immediately come to mind are one, we can ask you, as

8    you intimated, to certify something as a final order.  But two,

9    depending on how you rule, and certainly I do not feign to take

10   anything for granted going to today, I think there's a very

11   real universe where if Serv Trust is found to be Mr. Myers'

12   alter ego, we would then -- and I do not speak for Ms. Wilburn

13   or Mr. Pelletier -- there's a very real universe where we would

14   then happily dismiss all extent claims.  Mr. Myers does not

15   have any affirmative claims in this case.  We do not need him

16   to join us in consenting to a dismissal of all of the other

17   matters that pend.  We would do so without prejudice so that

18   they may be appropriately raised in the Bankruptcy Court, and

19   then we would have ourselves a final order just a few moments

20   after you signed it.

21          THE COURT:  Well, the other thing is I'm not hearing

22   that there's any stay that was issued by the Bankruptcy Court

23   or by the Middle District of Florida.  And so unless you all

24   hear of a stay, then you need to let me know.  But I think

25   generally I agree with you.  It's likely to be a final order,

14

1  it's been appealed, but an appeal does not necessarily stay --

2          MR. MASTRO:  Right.

3          THE COURT:  -- in the line of order.

4          MR. MASTRO:  Right.

5          THE COURT:  What it could do is this could all be

6  moot if the Appellate Court decided that it was going to

7  reverse the Bankruptcy Court, so.  And I know you wanted to say

8  something for a while, so I'm happy to from you.

9          MR. MASTRO:  Yes.  Again, Frank Mastro on behalf of

10  the bankruptcy trustee in Maryland.  I agree wholeheartedly

11  with everything Mr. VerStandig is saying.  I'll just add

12  additionally that the order of remand refers to the arguments

13  raised by Mr. VerStandig in his remand motion, one of which was

14  remand on equitable grounds, which are made expressly

15  nonappealable under the applicable statute.  So in addition to

16  the order being purportedly not final in Florida, the grounds

17  make it expressly nonappealable.

18          THE COURT:  Right.  Because, I mean, the

19  bankruptcy --

20          MR. MASTRO:  And as Your Honor just pointed out, that

21  was my other point I was going to make was that there's no stay

22  in effect.

23          THE COURT:  Right.

24          MR. MASTRO:  So we don't see any reason from the

25  bankruptcy trustee's perspective, anyway, that this proceeding

1  can't proceed today.

2        THE COURT:   Okay.

3        MR. MASTRO:   I mean, his bankruptcy estate's been

4  open for over seven years and we really want to get a

5  resolution.

6        THE COURT:   I know.   I see my friend, Judge Lipp, was

7  the original judge on this.   So the order of abstention also

8  doesn't note that any issues with respect to the stay can be

9  litigated in this court.   Because one of the things that when I

10 was looking at the abstention order, it says so numeral factors

11 from the discretionary abstention applies as stated by -- oh,

12 it states the Glass v. Glass case where "the state court may

13 not grant relief from the stay.   This matter is committed

14 exclusively to the Bankruptcy Court.   But it may when presented

15 with an issue to determine whether factually or legally a stay

16 is in effect and whether a particular action is about to take

17 or as already taken is subject to a stay."

18        So it says here, "There's no need for the Bankruptcy

19 Court to wait in the State litigation, the state court has been

20 presiding over litigation for a while."   And we get in bits and

21 spurts and then it stops.   So it says that the state court

22 determines the Government's stay is applicable based on the

23 relationship between the debtor and Serv Pro [sic], then the

24 matter will be stayed and the parties can come back to this

25 court to figure out how to proceed.

 1          So it sort of punted this -- even the issue is to
 2   whether -- and all I'll say is really I actually thought we
 3   were going to go forward on your Count I today, their count
 4   against Serv Pro [sic] and that we weren't going to go forward
 5   on the alter ego because of the close relationship between the
 6   parties.  And that I didn't know if the alter ego got you
 7   anything.  Certainly doesn't seem to get you more of anything
 8   in a sense that Count I gets you, if you're successful on that,
 9   the redemption of the rights from Serv Pro [sic], and then
10   really then you're sort of done.  And then their claim is
11   against Serv Pro [sic] for the amount due on the notes.  And if
12   they're successful, I think that can be litigated without
13   affecting Mr. Myers, basically, under a Frow doctrine.

14          The reason that sort of I would go forward on their
15   claim today, as opposed to the waiting until the defaulting
16   parties, because I don't know when and if Mr. Myers would ever
17   be subject to determination in this court depending on what the
18   Bankruptcy Courts decide.  They could modify the claims or
19   reduce the claims.  And I understand that in the Maryland Court
20   that the -- I guess I'm looking for the word, it's escaping me
21   at the moment -- discharge was denied or revoked.  I guess it
22   was a discharge and then it was subsequently taken back.  So I
23   would have to think about the alter ego claim.  What I'm going
24   to propose we do, just so we don't waste everybody's time, is
25   why don't we put on evidence of all of it.  And then I'll think

1  about whether or not -- because I do think, and I'll ask the

2  trustee's counsel.  Under the order of abstention, if I am to

3  decide whether or not the estate would apply to the altered ego

4  claim that was not decided in the Bankruptcy Court, the way I

5  read the abstention order.  I'm just asking if the trustee has

6  any thoughts on that.

7          MR. MASTRO:  I mean, the --

8          MR. VERSTANDIG:  I have but one sentence, and then

9  I'll sit down --

10          MR. MASTRO:  Yes.  I mean, the --

11          MR. VERSTANDIG:  -- shut up, I promise.

12          THE COURT:  Okay.

13          MR. VERSTANDIG:  I believe, and obviously I'm reading

14  into Judge Lipp's language.

15          THE COURT:  Right.

16          MR. VERSTANDIG:  I believe the determination of the

17  applicability of the stay is synonymous with the existence of

18  the alter ego relationship, and the two are legally

19  coterminous.  If it is an alter ego, the stay applies for all

20  other purposes and we return to the Bankruptcy Court.

21          THE COURT:  All right.

22          MR. VERSTANDIG:  If it is not an alter ego, the stay

23  applies for no other purposes understanding the monetary claim

24  is stayed by virtue in Florida Bankruptcy and we go forward in

25  your court.  But you did not direct that to me and --

1          THE COURT:  Okay.

2          MR. VERSTANDIG:  -- I mean no disrespect.

3          THE COURT:  All right.

4          MR. MASTRO:  Yes.  And my understanding is that with

5   respect to the Maryland Bankruptcy, there is no stay in effect

6   as to the alter ego because of the order of abstention saying

7   you need to go litigate this in state court.  To the extent

8   there was any sort of stay in Florida, that's been lifted.

9          THE COURT:  Right.  But I would agree then, yes.  But

10  I was troubled by the language in the stay order, which says a

11  state court has concurrent jurisdiction with the Bankruptcy

12  Court to determine the applicability of the automatic stay, and

13  then goes on to cite the Glass case and says basically if I

14  determine that the stay applies, then I send it back to the

15  Bankruptcy Court to determine what happened.  Which to me is,

16  I've never really seen that in a abstention order.

17         MR. MASTRO:  And I think the posture of these cases

18  was a lot different, what is it, five years ago, 2017, 2018,

19  that order?

20         THE COURT:  2019, yes.

21         MR. MASTRO:  2019.  So I'm not sure off the top of my

22  head what the posture of the case was at that time where

23  possibly there could've been something here to litigate in

24  terms of does the stay apply or not.  It may be does the stay

25  apply as to the other claims besides the alter ego.

1           THE COURT:  Okay.  I mean, yes, that's what I said

2   it's --

3           MR. MASTRO:  So and to the extent he was making that

4   argument at that time, and again, it's been so many years, Your

5   Honor, I don't recall off the top of my head.

6           THE COURT:  Uh-huh.

7           MR. MASTRO:  Well, was he making an argument that the

8   stay applies to these other claims back in 2019?  I don't know

9   off the top of my head.

10          THE COURT:  Okay.  All right.  And dealing with the

11  alter ego, I mean, Maryland's probably the worst state to try

12  to push forward an alter ego argument given the fact that the

13  court says you still have to prove fraud or the paramount

14  equity even in an alter ego situation and the paramount equity

15  has been defined as fraud.  So I'm still waiting for the case

16  that ever comes out and says, well, there's not fraud here, but

17  there's a paramount equity.  And I understand that you may be

18  actually alleging fraud in a certain extent.  Certainly,

19  fraudulent conveyance, and so forth, is sort of at the heart of

20  the allegations.

21          MR. VERSTANDIG:  Your Honor, to go to what you said a

22  moment ago.  I know we're all prepared to proceed on all of the

23  causes of action today.

24          THE COURT:  Uh-huh.

25          MR. VERSTANDIG:  I enjoy this colloquy more than I

1  probably give off because I find this fascinating.  But at the
2  same time --

3          THE COURT:  Let's get going.

4          MR. VERSTANDIG:  -- maybe there's some sense in
5  putting on some evidence.

6          THE COURT:  Yes.

7          MR. VERSTANDIG:  And then in closing, we can have --
8  I mean, there's really, it's not even a chicken and egg so much
9  as a chicken eating an omelet for breakfast, and we can try to
10 figure out where that all falls.

11         THE COURT:  Okay.  Sounds fine to me.  All right.  So
12 who wants, I guess my understanding was the King defendants
13 were going to go first, or do you want to put the note on
14 first?

15         MR. VERSTANDIG:  Your Honor, if I can -- we'll go
16 first.

17         THE COURT:  Okay.

18         MR. VERSTANDIG:  I'll give a brief opening with your
19 blessing.  And then as is probably manifest, I do intend to put
20 Mr. King on the stand.  And there are some exhibits in front of
21 you that we're going to try to find our way into evidence.

22                            JUDGE'S RULING

23         THE COURT:  All right.  And why don't you just do a
24 little bookkeeping.  There was a motion to recuse me that was
25 filed.  And I did get your motion to stay every other motion

1 that was pending. I agree with you on everything but the

2 recusal. I think that since I have to potentially decide an

3 issue about the stay potentially from the order of abstention,

4 that as far as you would have at least standing to complain

5 about me hearing the case, I have looked at his motion, I've

6 looked back I think about a year ago. He orally made the same

7 motion. The motion is based upon my affiliation with the firm

8 of Gordon Feinblatt between the years of 1991 and 1997.

9 Frankly, if Mr. Myers had not raised the fact that Gordon

10 Feinblatt has some connection, which I'm still not even sure

11 exactly what it is, I wouldn't have been aware of it. But

12 certainly I've had attorneys from Gordon Feinblatt actually

13 appear and represent parties before the Court in litigation

14 given the amount of time, which would now be close to 25 years,

15 probably more than 25 years, that I have no problem hearing the

16 case. I don't believe that it would affect my ability to be

17 fair and impartial in the case.

18        Therefore, I am going to deny the motion for recusal

19 for a second time in this matter. With respect to, there was

20 an order or motion filed to -- this is bookkeeping from my

21 clerk here. Shoot, what did I do with that? All right.

22        So there's the King parties filed a motion to hold

23 the debtor's pending motions in abeyance pending termination of

24 the automatic stay. That was joined by 6789 Goldsboro, LLC.

25 So I'm going to grant that motion with the exception of the

1    motion for recusal, which I have denied.  All right.

2              MR. PELLETIER:  Your Honor, before we get off to the

3    races --

4              THE COURT:  Sure.

5              MR. PELLETIER:  -- this is Eric Pelletier for the

6    record.  I just wanted to clarify the order of operations here.

7    Are we going to do opening statement, opening statement, his

8    evidence, my evidence, just keep it going because --

9              THE COURT:  Yes.  Let's just do that.

10             MR. PELLETIER:  Okay.  To that end, Mr. VerStandig's

11   exhibits end at No. 22.  I don't have tabs from 23 up, but I

12   can mark them with a plaintiff's exhibit sticker.

13             THE COURT:  Okay.  That's fine.

14             MR. PELLETIER:  Okay.

15             THE COURT:  You shouldn't have that many I wouldn't

16   think.

17             MR. PELLETIER:  I have like four.

18             THE COURT:  Yes.  I was going to say.

19             MR. PELLETIER:  Thanks.

20             THE COURT:  Okay.  All right.  So if you want to give

21   an opening, I'm happy to hear you.

22             OPENING STATEMENT BY MAURICE VERSTANDIG, ESQ.

23                     ON BEHALF OF PLAINTIFFS

24            Thank you, Your Honor.  And I will try to trim this

25   down because I think some of it may be redundant to what was

23

1    just discussed.

2              THE COURT:  Okay.

3              MR. VERSTANDIG:  But at core, there are three

4    questions that will come before the Court today as it concerns

5    my clients.  I think that Mr. Pelletier and Ms. Wilburn have a

6    separate client with a separate interest, albeit a related one.

7              The first question is whether or not Serv Trust was

8    Mr. Myers' alter ego at the time he sought bankruptcy relief in

9    2015.  The second question is whether or not the King parties,

10   which is going to be the colloquial reference to Brian King,

11   Christina King, and the Christina and Brian King Children's

12   Trust, have properly exercised the redemption mechanism under

13   the amended and restated operating agreements of 6789

14   Goldsboro, LLC to redeem the class B interests therein we

15   maintain formerly held by Serv Trust.

16             And then the third question I would imagine is going

17   to be the least advocated today given the absence of a lawyer

18   for Serv Trust, but Serv Trust has counterclaims in this

19   matter.  The counterclaims allege myriad things that we

20   maintain to be fantastically and whimsically imaginative, but

21   that bear no resemblance to this universe or even close

22   parallel thereto.  And --

23             THE COURT:  With respect to the counterclaims, I

24   mean, there's not going to be any evidence presented.

25             MR. VERSTANDIG:  Right.

24

1          THE COURT:  So I would imagine at the close of the

2   case you can ask for a motion on that.

3          MR. VERSTANDIG:  Yes, Your Honor.

4          THE COURT:  And so that's how I anticipated that we

5   would deal with those claims.  I know there was summary

6   judgment motions filed, and I understand what their claims

7   were, but without evidence in court, and since they have not

8   either appeared or appeared by counsel here today, then we'll

9   dispose of those at the appropriate time.

10          MR. VERSTANDIG:  Thank you, Your Honor.  Your Honor,

11   by way of background, what the evidence is going to show, and

12   it certainly seems you have read this file in great detail and

13   we appreciate that you seem to know this better than we often

14   encounter when we come to judges for the first time, second

15   time, and so on and so forth, is that Gregory Myers found

16   himself in a situation where he needed money.  And I'll

17   reiterate what I said earlier.  There's going to be a lot of

18   references to Mr. Myers today.  None of them are in furtherance

19   of any claims for monetary relief against him initially.

20          Mr. Myers needed money in general and Mr. Myers found

21   a property at 6789 Goldsboro in Bethesda, Maryland, that he

22   thought could be profitably developed, but he lacked the

23   resources to acquire it.  And through various circumstances he

24   was introduced to Mr. King, and they agreed that on negotiated

25   terms, which will be reflected in the record, they would move

1  ahead with Mr. King and his family putting up, when I say the
2  lion's share of the capital, I mean to the extent that what
3  came out of Mr. Myers' camp is statistically de minimis in
4  nearly every regard.

5      And a bargain was inherent in all of this.  Mr. King
6  and his family would put up almost all of the money.  In fact,
7  as soon as they closed on the acquisition of the property, the
8  $6,000 and some odd dollars that had been put up by Serv Trust,
9  which I'll get to in a moment, would be dwarfed by a $300,000
10 distribution from the company to Serv Trust to fund Mr. Myers'
11 lifestyle.  And in exchange for the King parties putting up all
12 the money to acquire the property to pay lawyers to investigate
13 the development of property, architects to investigate the
14 development of the property, engineers to work on the project,
15 and so on and so forth, they would have the class A membership
16 interest in this entity, and Serv Trust would have the class B
17 membership interest.

18     And under the terms of the operating agreement, there
19 would be a period of three years.  And if at the end of those
20 three years the property had been sold, money would be divided
21 up accordingly.  And if at the end of three years, the property
22 appraised for more than the cumulative capital contributions of
23 the King parties to date, they're willing to go forward
24 accordingly, that would mean that Mr. Myers as the finder, who
25 became the manager of 6789 Goldsboro and was chiefly in charge

1  of its development using the financing of the King parties, had
2  been successful in creating value, then everyone would go
3  ahead.  But if at the end of three years, or anytime
4  thereafter, the property appraised for less than the cumulative
5  capital contributions of the King parties, Serv Trust and trust
6  would be redeemed, and they'd be deemed for no consideration.

7  And in essence, this was a great deal for Mr. Myers.
8  He had no money, nothing to put up, and get $300,000 minus the
9  $6,000 and change, as soon as closing occurred, and Mr. King
10  was giving him the opportunity.  If you can make this a
11  profitable project, you're going to end up owning half of it,
12  you'll get half the proceeds, and everything is wonderful.  And
13  if not, you get $300,000 for your trouble, which is not bad for
14  three years of work, I might add.  And if it doesn't work out,
15  I, meaning Mr. King and his family, have borne the entirety of
16  the financial obligations other than $6,000 and change, and we
17  will redeem the interest and do what we can today and get out
18  of this project.

19  And low and behold, the three years came and went,
20  and on the third anniversary, Mr. King did nothing.  Kept
21  giving Mr. Myers a chance.  Believed that Mr. Myers might
22  actually be making good progress.  And they marched forward and
23  they marched forward, but finally, and the evidence will show
24  this in some detail, Mr. Myers endeavored to defraud Mr. King,
25  Christina King, and the Christina and Brian King Children's

1  Trust.  And at that point, Mr. Myers was ousted as manager and
2  the redemption mechanism was triggered, and it was triggered in
3  accord with the operating agreement with a demand being sent to
4  Serv Trust and an appraiser being timely appointed.  That
5  appraiser conducted an appraisal, you will see that appraisal
6  in the record.  The appraisal puts the property value between
7  of $1 million and $1.35 million at that moment in time.

8         The King parties' class A contributions toward the
9  project were close to, if not in access, of $3 million at that
10  point in time.  And thusly, Serv Trust had its interests
11  redeemed.  Now Serv Trust had the option to appoint a counter
12  availing appraiser to get someone to go out and look at it, of
13  Serv Trust's choosing, to be paid by Serv Trust, and to say no,
14  it's worth 5 million, it's worth 10 million, whatever a
15  certified appraiser may do.  Serv Trust did not exercise that
16  option.  And we know that Serv Trust got the King parties'
17  demand because we have a response from Mr. Myers in his
18  capacity as trustee of Serv Trust acknowledging receipt
19  thereof, which will be part of the record today.

20         Now let's take a step back and talk about Mr. Myers
21  and Serv Trust and what the record will show there.  The record
22  will show that Mr. Myers put this investment project in the
23  name of Serv Trust because he was enmeshed in litigation in
24  myriad jurisdictions, had not paid a mortgage in a great many
25  years, and was financially insolvent by every measure and

almost certainly destined for bankruptcy when he found us.  He

used Serv Trust to move money to himself and to his wife,

Barbara Ann Kelly, for almost -- and I will emphasize the word

almost because there are some exceptions -- almost exclusively

the benefit of himself and his wife.

And at first it is evident that the project was

placed in the name of Serv Trust so that it would not be an

asset of Mr. Myers' collectable, sizable, garnishable or

otherwise speakable by any of his creditors.  And then that

took on a very real form when Mr. Myers sought bankruptcy

relief.  And when Mr. Myers was in bankruptcy, he was initially

a debtor in Chapter 11.  That is the ultimate open kimono

construct.  Everyone gets to see just about everything, its

monthly operating reports.  So how could he hide vast monies

that he needed to go on and pursue a lifestyle that involved

country clubs, leisure and vexatious pursuits?  By constantly

using Serv Trust as his alter ego.

And time and again, he went to Mr. King, and for

reasons that were clearly personal to Mr. Myers, his desire to

pay country club dues, his desire to pay his own lawyers, his

desire to put monies into the registry of a court in a case in

which he is personally a party, he asked that 6789 Goldsboro

loan funds to Serv Trust.  And what the record will show is

that 6789 Goldsboro time and again loaned those monies, you'll

hear about that from Mr. Pelletier and Ms. Wilburn.  And almost

1  as soon as those monies were in Serv Trust, out they went to
2  Mr. Myers and Ms. Kelly.

3      Now I said almost, but I want to emphasize it in the
4  interest of candor.  There are a handful of expenses that were
5  clearly for the benefit of Mr. Myers' children.  We can't deny
6  that some monies were used to benefit his children.  But
7  ultimately, it is a pittance of the vast sums of money that
8  went in and out of Serv Trust.  And that is what guides a lot
9  of the alter ego issues that we'll be presenting today.

10      So Your Honor, we believe the evidence is going to
11  show that under the operating agreement the redemption
12  mechanism was properly exercised, and that if you choose to
13  rule on that matter, you will find that Serv Trust is no longer
14  a member of 6789 Goldsboro, LLC, and that the only members, and
15  we ask the Court to enter a declaratory judgment, are Mr. King,
16  Ms. King, and the trust for the benefit of the children.  If
17  you choose to rule on the alter ego issue, and to some degree
18  we respectfully submit, it may be mutually exclusive at the
19  close of evidence.  I think you're going to be constrained to
20  one or the other.

21      We believe the evidence will show that Mr. Myers
22  exercised complete dominance over Serv Trust.  That that
23  dominance was used to propagate harms to the detriment of his
24  creditors, including his bankruptcy trustee who's represented
25  by counsel in your court today, and that actual harms were in

1  fact perpetrated because the assets of Serv Trust were thusly

2  not made available to his bankruptcy estate and not made

3  available for distribution to his creditors or negotiations

4  through the operation of the entity.  And that is why Mr.

5  Myers' first bankruptcy trustee is represented by counsel in

6  your courtroom today.  We understand this is an unusual case.

7  We understand it comes with a lot of baggage and a lot of

8  years.  We appreciate your time, and we look forward to putting

9  on our evidence.

10            THE COURT:  All right.  Thank you.

11            OPENING STATEMENT BY ERIC PELLETIER, ESQ.

12              ON BEHALF OF THE DEFENDANTS

13            Good morning, Your Honor.  Eric Pelletier here for

14  6789 Goldsboro, LLC, with Ms. Wilburn, of course.  And I can

15  just tell you I'm going to be brief and I will be nowhere near

16  as eloquent.  I have a far more simple case, and I have the

17  benefit of piggybacking off of Mr. VerStandig's case which, and

18  I don't disagree with his opening.  Ms. Wilburn and I represent

19  6789, which I may refer to it as.  We have two claims; they're

20  both being presented against Serv Trust.  And just for the

21  record, we are not proceeding against Mr. Myers here today.

22  Count I is a breach of contract claim for a promissory note.

23  Count III is a promissory estoppel claim for which we're only

24  proceeding against Serv Trust.

25            It'll be very clear when you receive the note, it's a

1  very simple claim, and we've already pointed out that I'm only
2  going to have a few exhibits, that the promissory note, the
3  maker and the borrower was Serv Trust.  The holder was 6789
4  Goldsboro Road, LLC.  The note covers both prior advances,
5  which the note memorializes, and allows for future advances to
6  be made.  You will see evidence today, a tally sheet that Mr.
7  King has kept during the course of the loans and has kept
8  current, that the total loan was $635,000 under the promissory
9  note.  The interest under the note provided, in the note itself
10 is 10 percent, which through January 1st I think it was,
11 totaled to $499,937.50.  The total due, principle and interest,
12 under the note will be shown to be $1,264,737.76.  Added to
13 that, there are attorney's fees provided in the note.  The
14 attorney's fee total, as of these many years of litigating, is
15 $129,826.  And of course, you'll see from the bills, that
16 includes 4As and Bankruptcy Court, so on and so forth.

17          And then comes the other issue, which is the
18 promissory estoppel issue, which Mr. VerStandig actually
19 referred to in his opening in passing.  And that is the
20 $300,000.  The initial advance was $300,000, not covered
21 specifically within the promissory note, but the understanding
22 was that Mr. Myers would take the money, make good on it, they
23 would do the reconciliation of the sort that Mr. VerStandig
24 explained during his opening statement, and at the end, the
25 $300,000 would come back to 6789, and that was why the loan was

1  made at the get-go to start off this whole adventure.  That

2  will be our case.  It's going to be very simple.

3          THE COURT:  Why wasn't the 300,000 included in the

4  note?

5          MR. PELLETIER:  It came before the note and it wasn't

6  included, and we can go into that with Mr. King.

7          THE COURT:  Okay.

8          MR. PELLETIER:  But my understanding was it was

9  considered an initial distribution to come back out and be

10 repaid after the project became successful, which ultimately it

11 didn't because of stonewalling, and so on, of Mr. Myers.

12         THE COURT:  I mean, isn't that just a definition of a

13 loan?

14         MR. PELLETIER:  It is a loan.

15         THE COURT:  I mean, if you're saying it's not a

16 capital -- or distribution.

17         MR. PELLETIER:  Frankly, it is effectively a loan.

18 It was supposed to be paid back.

19         THE COURT:  Okay.

20         MR. PELLETIER:  It was supposed to be reconciled at

21 the end.  It wasn't free money.  It wasn't a gift to Mr. Myers.

22         THE COURT:  Okay.

23         MR. PELLETIER:  It was a comeback.

24         THE COURT:  All right.  So then you do disagree with

25 what counsel said, because he said at the end of the day he was

1    going to get the $300,000.

2          MR. PELLETIER:  Well, I think that's a minor

3    disagreement.

4          THE COURT:  Okay.

5          MR. PELLETIER:  He said he was going to get it before

6    the project was effectively stonewalled when Mr. Myers not

7    doing anything he was supposed to do under the operating

8    agreement, not pursuing the property valuation, so on and so

9    forth.

10          THE COURT:  Okay.  My understanding was that the big

11    problem was he didn't get the subdivision numbers that you were

12    looking for from the county I would guess.  The overall goals

13    for all the -- what are we looking for, 16 units?  I may have

14    the number wrong.

15          MR. PELLETIER:  Right.

16          THE COURT:  But it's the number of units that you

17    were trying to get.

18          MR. VERSTANDIG:  Nineteen.

19          MR. PELLETIER:  Yes.

20          THE COURT:  Thirty-two, all right.  I had it in half

21    so.

22          MR. VERSTANDIG:  Nineteen, you were close.

23          THE COURT:  Nineteen.  Okay, 19.  So they were

24    looking for 19, and you just didn't get that approval.  And

25    then that really was, to me, is at least what I thought was the

1  big problem was that at that point then the project wasn't

2  going to be profitable given the outlays of that.

3          MR. PELLETIER:  Well then there was no opportunity

4  for the valuation process to go forward after that because Mr.

5  Myers sat on his hands.

6          THE COURT:  Right.  I got you.  All right.

7          MR. PELLETIER:  Thank you, Your Honor.

8          THE COURT:  All right.  I'm going to ask the counsel

9  for the trustee if you have any --

10         MR. MASTRO:  No.  We have --

11         THE COURT:  -- information.

12         MR. MASTRO:  We have no position.

13         THE COURT:  All right.  All right.  So call your

14  first witness, or go through it any way you want.

15         MR. VERSTANDIG:  Your Honor, we call Brian King, but

16  I think we're going to do a couple of things to make this a

17  little bit shorter --

18         THE COURT:  Okay.

19         MR. VERSTANDIG:  -- given how we're postured today.

20         THE COURT:  All right.  Mr. King, he can testify from

21  counsel table --

22         MR. VERSTANDIG:  Excellent.

23         THE COURT:  -- if he likes.  That way he can look at

24  documents.  There's nobody -- there's no jury here or anything.

25  And actually, I get a better view of him from here than I do

1  from on the stand.

2          THE CLERK:  Do you want me to swear him in?

3          THE COURT:  Yes.  If you could stand and raise your

4  right hand, please.

5          THE CLERK:  Thank you.

6          THE COURT:  All right.  Sir, you can have a seat and

7  make yourself comfortable.  Counsel, you may proceed.

8          MR. VERSTANDIG:  Thank you.  Your Honor, I don't want

9  to be abusive of the fact that there's no opposing counsel, but

10  in the interest of streamlining things, we have marked 22

11  exhibits that have been handed to Your Honor with the copies

12  also handed to the clerk of the Court.  They're each marked 1

13  through 22.  At this time, the King parties move the admission

14  of Exhibits 1 through 22.

15          THE COURT:  All right.  They'll be no objection

16  obviously, so I'll go ahead and I'll admit the Exhibits 1

17  through 22 at this time.

18          MR. VERSTANDIG:  Thank you, Your Honor.

19                              (The documents marked for

20                              identification as Plaintiff's

21                              Exhibit Nos. 1 through 22 were

22                              received in evidence.)

23                          BRIAN KING

24  the plaintiff, having been first duly sworn, was examined and

25  testified as follows:

36

1                    DIRECT EXAMINATION

2          BY MR. VERSTANDIG:

3      Q    Mr. King, please state your name for the record.

4          MR. VERSTANDIG:  Your Honor, is it okay if I sit --

5  keep sitting?

6          THE COURT:  You can have a seat if you would like.

7          MR. VERSTANDIG:  Thank you.  It seems awkward

8  hovering over my client.

9          THE COURT:  Okay.

10         THE WITNESS:  Brian King.

11         BY MR. VERSTANDIG:

12     Q    And Mr. King, what's your business address?

13     A    3925 Beech Avenue, Suite 100, Baltimore, Maryland,

14  21211.

15     Q    Mr. King, what is it that you do for a living?

16     A    I own property, have a property management company,

17  and have developed properties in the past.

18     Q    Do you have any relationship with the entity known as

19  6789 Goldsboro, LLC?

20     A    Yes.  It's an entity that I went into to develop the

21  land.

22     Q    Okay.  And are you a class A member of that entity?

23     A    I am a class A member.

24     Q    Okay.  And are the other class A members your wife,

25  Christina King, and the Christina and Brian King Children's

1  Trust?

2      A    That is correct.

3      Q    Okay.  And was there previously, and I understand

4  this is one of the issues we're litigating today, a class B

5  member?

6      A    Yes.

7      Q    Okay.  And that was an entity that at least had held

8  itself out as Serv Trust, correct?

9      A    That is correct.

10     Q    Okay.  So let's talk about 6789 Goldsboro.  May I

11  assume that there is a piece of property located at 6789

12  Goldsboro Road?

13     A    Yes.  It's a single-family property that sits on

14  five-and-a-half acres.

15     Q    And when did you first learn about the existence of

16  this property?

17     A    I learned about it in 2013.

18     Q    And how is it that you learned about it?

19     A    Through the trustee of my trust.  He let me know that

20  he had an acquaintance that was looking for an investor in a

21  development property.  And at that time, I was looking for

22  additional investments.

23     Q    Now, you said the trustee of your trust.  I want to

24  just be careful for purposes of the record.  Is that a

25  reference to the Christina and Brian King Children's Trust?

1    A    Yes.  He's trustee of the King Trust, yes.

2    Q    Okay.  And who was the acquaintance of your trustee?

3    A    Timothy Lynch.

4    Q    Was he the acquaintance or was he the trustee?

5    A    Oh, I'm sorry.  The trustee was Greg Myers.  I mean,

6 sorry.

7    Q    Let's try this again.  The Christina and Brian King

8 Children's Trust, was Timothy Lynch a trustee of that trust?

9    A    Yes, he was.

10    Q    All right.  And is he the individual who introduced

11 you to an acquaintance of his?

12    A    He is.

13    Q    All right.  And was that acquaintance of his Gregory

14 Myers?

15    A    It is.

16    Q    Okay.

17    A    Thank you.

18    Q    At the time, did Mr. Myers share with you that he was

19 going through anything or experiencing any issues?

20    A    When we met, I understood that he was having some

21 financial problems.  He let me know that personally as we were

22 going into this investment.  But I saw the opportunity in the

23 investment, so we moved forward.  And at that point, the

24 financial problems didn't seem to be that elevated.  I didn't

25 understand the extent of it at that time.

1    Q    Okay.  Now Mr. King, did the investment, as you moved

2  forward, proceed in Mr. Myers name or proceed in someone else's

3  name?

4    A    The investment proceeded in Serv Trust as the 50

5  percent capital class B shareholders.

6    Q    And did Mr. Myers share with you that that's because

7  he didn't want to hold the asset in his name?

8    A    He did.  He had -- he was having some issues and he

9  felt it would be best for the LLC, the entity, to his shares of

10  the entity to be held in his Serv Trust, which was another

11  entity.

12    Q    And you agree --

13        THE COURT:  So I'm clear, Serv Trust was the trust,

14  not an LLC, right?

15        MR. VERSTANDIG:  Yes.  Your Honor, Serv Trust is what

16  we maintain to be a statutory trust.

17        THE COURT:  Right.

18        MR. VERSTANDIG:  And it is not an LLC.

19        THE COURT:  Okay.  I just -- it might have been that

20  he initially was talking about setting it up as an LLC.  I just

21  want to make sure that he was always looking to have it at

22  least held in that third-party entity.

23        BY MR. VERSTANDIG:

24    Q    Mr. King, if you could look at Exhibit 1.  If you

25  turn to the signature pages, which I'll submit to you begin

40

1  about six pages before the end of the exhibit, or maybe seven
2  pages -- turn back a couple.  One more.  One more.  All right.
3  Do you recognize the signature of Mr. Myers above his name?
4      A    I do.
5      Q    All right.  And above Mr. Myers' signature, does it
6  say Serv Trust, a Maryland Statutory Trust?
7      A    It does.
8      Q    And is that how Serv Trust had been represented to
9  you at the time you, Ms. King, and your children's trust
10  entered into the Goldsboro arrangement with Serv Trust?
11      A    Yes.
12      Q    Now, did there come a time when Mr. Myers sought
13  bankruptcy relief?
14      A    I believe he wanted to -- at some point in 2015, he
15  came to me in the middle of our -- when we were in the middle
16  of doing the redevelopment and let me know that some of his
17  financial woes was turning into him going into personal
18  bankruptcy.
19      Q    Now, because the exhibits are all into evidence, I'm
20  actually going to skip a head a bit.  If you could look at
21  Exhibit 4.  From the beginning of the Goldsboro arrangement
22  with Serv Trust as the class B member and yourself, your wife
23  and your children's trust as a class A member, where there
24  times when Mr. Myers asked for money?
25      A    Yes.

1    Q    Okay.  Please tell the Court about that.  For what
2  reasons was he asking for money and how did this work?

3    A    Originally, he came at the closing when we bought the
4  entity.  He initially requested $300,000 as a advance to early
5  distribution of funds that he would eventually pay back, you
6  know, when we sold -- sold the property.  He initially kind of
7  ran through those initial funds very quickly, I think we closed
8  in July and by January we was starting to come back to me and
9  ask me for additional funds.  And that seemed to happen more
10  and more frequently, and I continued to feel that there was
11  value in the property, we were making some progress, and I
12  continued to lend him money through the course.

13         The second question is what was he using it for.  He
14  was coming and asking me -- he was having some financial
15  problems with some properties in Florida.  He was -- he needed
16  to get -- put gas in his tank, he had country club bills that
17  he mentioned that needed to be paid.  There are -- there is a
18  lot of, like, lifestyle monies that he was burning through very
19  quickly.  I believe he was paying mortgages on homes in other
20  investments that he had.  Paying legal fees to kind of keep
21  him -- initially it was to kind of keep him out of bankruptcy,
22  and then I think it turned into paying for bills for his
23  bankruptcy.

24    Q    Now, looking at Exhibit 4.

25         MR. VERSTANDIG:  And Your Honor, let me clarify

1  something that's going to become inadvertently confusing.  I

2  believe Mr. King is going to testify about this is a

3  spreadsheet he keeps in the ordinary course of business.  The

4  version is our Exhibit 4 is a copy of that spreadsheet as it

5  existed on May 14, 2018.  I have reason to believe that 6789

6  Goldsboro may offer a different version into evidence that has

7  a later date.  Their interests are slightly different.  Ours

8  would be -- the points we'll try to make is slightly different.

9  So if this spreadsheet looks like it morphs later on today, I

10 promise you there will be a good explanation in closing.

11          THE COURT:  Okay.

12          BY MR. VERSTANDIG:

13     Q    So Mr. King, looking at this spreadsheet, let's start

14 with this.  Is this something you created?

15     A    Yes, it is.

16     Q    Okay.  Can you explain to the Court, starting on the

17 top half of the first page, what these numbers, rows, and

18 columns mean?

19     A    The top half, it was my way to keep track of all

20 monies that flowed into 6789 Goldsboro.  You can -- and on the

21 first page, you can see that it's the King would be myself and

22 my wife, and on the bottom it's the King Trust.  So the two of

23 those kind of mirror kind of what was spent.  There is kind of

24 the origination date, the closing happened on July 18th.

25 Simultaneously, you can see up top on the King you can see

43

1  1.105 roughly, approximately, a million dollars was 80 percent
2  of the property, the trust, the King Trust owns 20 percent, so
3  you can see that equals the entire purchase price of, like,
4  $1.35 million to buy this piece of property.  Simultaneously,
5  at closing you can see kind of the 80-20 split of the
6  distribution advance that went out to Serv Trust.

7      Q    Is that the 240 on the top half and the 60 on the
8  bottom half?

9      A    That is correct.

10     Q    Okay.

11     A    And then these loans are all calculated based on --
12 simple interest based on the day that the loans were made.  So
13 when they hit the bank account, the monies flowed out of the
14 account.  The interest rate that was agreed upon on the loan
15 was 10 percent, so you can see that the days outstanding, and
16 this spreadsheet is as of 5/14.  You see days outstanding, you
17 see the principal of all money that was put into Goldsboro,
18 6789 Goldsboro, the interest on each one of those advances, and
19 the principal and interest in the last column.

20     Q    Mr. King, if you turn to the second page, about one-
21 third of the way down the page we see a total combined
22 contribution line.  And do I understand that the number
23 directly next to that is the total combined principal
24 contributions of yourself, your wife, and your children's trust
25 without the application of any interest?

44

1     A     That is correct.

2     Q     And that's $2.79 million, correct?

3     A     That is, yes, approximately.   Yes.

4     Q     Okay.   Now at the bottom of the second page, there's
5  an area that on the left is marked as Loans to Serv Trust.   Now
6  help me understand what these numbers are.

7     A     So the initial spreadsheet, this tracks all capital
8  that went into Serv Trust.   So this included most of the soft
9  development costs plus any other monies that flowed out.   And
10  the -- Greg, Mr. Myers, continued to ask for additional funds
11  to fund his lifestyle.   I, you know, at the time I agreed to
12  continue to fund this as we were making progress and I saw
13  value there.   But you can see that, like loans to Serv Trust
14  2/27 -- 2/27/2014, which was about seven or eight months after
15  the closing where I had initially advanced him 300,000.   He
16  came back and asked for another 100,000.   So at this point, I
17  wired him another $100,000, and then you can see that all of
18  the advances that I had made to him, which is what kind of that
19  section of the spreadsheet shows, is he continued to come back
20  to me asked me for more money for, you know, a multiple -- a
21  lot of reasons to fund a lifestyle, to keep him out of
22  bankruptcy, for a lot of reasons.   I'm not, yes.

23     Q     All right.   Can you turn to Exhibit 5?   And Mr.
24  Pelletier and Ms. Wilburn may cover more of this later in the
25  day, but is this a promissory note that represents some, albeit

1  not all, of those loans to Serv Trust?

2      A    That is correct.

3      Q    And if you look at the first line of the promissory

4  note, can you read from the words For Value Received Forward

5  into the record?

6      A    "The undersigned Serv Trust, a Maryland statutory

7  trust."

8      Q    Thank you.  And once again, was Serv Trust holding

9  itself out as a statutory trust when this note was entered

10 into?

11     A    It was.

12     Q    And that was in May of 2015, correct?

13     A    That is correct.

14     Q    Thank you.  Now, Exhibits 6 through 10 are email

15 communications that have been admitted into evidence that all

16 involve yourself and Mr. Myers.  Do I understand correctly that

17 these are exemplifications on an anecdotal basis of the reasons

18 Mr. Myers was asking monies to be loaned to Serv Trust?

19     A    That is correct.

20     Q    Okay.  In any of these emails, does he ever say that

21 Serv Trust needs the money or does he suggest that it is he who

22 needed the money?

23     A    Either in phone conversations or in these emails,

24 it's -- he's telling me that he needs it -- he was using it to,

25 again, to fund his lifestyle, to pay his bills, put gas in his

1  tank.  He was trying to keep loans afloat down in Florida so

2  that they did not go into default.  There is -- again, there is

3  a lot of things that were kind of going on in addition to

4  trying to run, you know, manage the property.  But when he was

5  asking for money, it was not most of the time.  There were a

6  couple of cases where he told me that it was to fund -- he

7  needed to pay his kid's education.  But some of it -- most of

8  the time it was to do things like pay the country club bill or

9  pay an attorney or keep a mortgage up to date.

10      Q    Now, looking back to Exhibit 4 a second, do I

11  understand the last loan was made on August 5, 2016?

12      A    August 5th, yes.  That's correct.

13      Q    If you could turn to Exhibit 10.  Is this an email he

14  sent five days later?

15      A    Yes it is.

16      Q    Would you characterize this email for the Court and

17  how you understood it as the recipient?

18      A    Over time, Mr. Myers was getting more desperate, more

19  aggressive towards me to kind of push me to continue to advance

20  him, you know, advance him loans to his -- he was falling

21  further and further into, you know, some financial issues.  I

22  was trying to just keep our relationship just about the

23  development.  But this email was -- I was having Danielle

24  (phonetic sp.), which it references in here, she was working on

25  the promissory note.

1    Q    Hold on.  Who's Danielle?

2    A    Danielle is the attorney that was working on the

3    promissory note.

4    Q    Okay.

5    A    And it was taking some additional time.  It just

6    normal, kind of business, you know, relationships with lawyers,

7    and I wasn't her only customer.  And he was just getting

8    desperate and needed monies quicker and he was putting pressure

9    not only on me but, you know, was having put money, some --

10   Q    This says, "Your decision hurts me and could possibly

11   put the project in jeopardy.  If I cannot pay my ongoing

12   expenses, then I suspect this will not end well."  Correct?

13   A    Yes.

14   Q    And it's referenced to him, not to Serv Trust, right?

15   A    That is correct.

16   Q    And did you interpret this as some sort of vague

17   threat?

18   A    I did.  And he was acting more and more desperate as

19   time went on.  And at some point, I decided that the monies

20   that were lent out were -- this is a business, it's a risk.

21   And part of my risk that I took was making loans, you know,

22   loans to him.  And if I did not feel that the property was

23   going to support that, at this point I told him that I would

24   not be making any more advances to him.

25   Q    Now, Mr. King, Exhibit 11, do I understand correctly

48

1  is a compendium of checks that were received in discovery

2  during this case from Serv Trust?  Meaning checks that were

3  issued by Serv Trust to third parties, or at least alleged

4  third parties?

5      A    That is correct.

6      Q    Okay.  And I'm going to ask you briefly, if you look

7  at the upper righthand corner you'll see Bates numbers as they

8  that were appended to these checks.  Could you go to the one

9  that's marked 317?

10     A    Okay.

11     Q    And is that a check payable to the Walton County

12  Clerk of the Court?

13     A    It is for $5,578.

14     Q    All right.  And could you go to check 342?

15          MR. PELLETIER:  Page 342?

16          MR. VERSTANDIG:  I'm sorry.  I'm sorry.  Bates number

17  342.

18          THE COURT:  Yes.

19          MR. VERSTANDIG:  Not check number 342, I misspoke.

20          THE COURT:  All right.

21          THE WITNESS:  Walton County Clerk of Courts for

22  $3,686.31 with the case number listed below.

23          BY MR. VERSTANDIG:

24     Q    And if I'm reading this correctly, the case number

25  ends in 6-6-0, correct?

1      A      That is correct.

2      Q      Okay.  Now, let's jump ahead for a moment, and we'll

3   come back to this, to Exhibit 14, which I understand is the

4   list of assets Mr. Myers filed in his bankruptcy; is that

5   correct?

6      A      That is correct.

7      Q      And if you go to page 17 and use the page numbers at

8   the top of the page as your guide as opposed to the bottom.

9   The federal courts have weirdly (unintelligible) it seems.  Do

10  you see a reference on page 17 to monies paid into the Walton

11  County Court Registry?

12     A      Yes.  Funds paid into Walton County Court Registry

13  for the property at 147 Silver Way for $22,117.86.

14     Q      Okay.  So we know from the checks that monies were

15  paid to Walton County Clerk of the Court, and we know from this

16  that there are monies paid to the Walton County Clerk of the

17  Court for 147 Silver Laurel Way, correct?

18     A      That is correct.

19     Q      All right.  Now if you go to page -- I'm sorry,

20  Exhibit 15 and turn to page 5.  On the third line, do you see a

21  foreclosure action for 147 Silver Laurel Way?

22     A      Yes.  Bank of America, yes.  Foreclosure action 147

23  Silver Way.

24     Q      And is there a case number next to it?

25     A      Yes.  CA000660.

1    Q    And do you understand from this that the checks Serv

2  Trust was cutting were being used to put monies into the

3  registry of the court for an action in which Mr. Myers was a

4  party?

5    A    Yes.  Yes.  It looked -- I mean, Serv Trust is

6  writing checks directly to the -- for the 147 Silver Way.

7    Q    And then when Mr. Myers filed bankruptcy, he claimed

8  that the monies from those checks were his asset, correct?

9    A    That is correct.

10    Q    Now, I'm going to back up just for clarification

11  purposes.  Let's look briefly at Exhibit 12.  Is this a

12  compendium of wire transfers, all of an outgoing nature, that

13  you received in discovery in this case?

14    A    That is correct.

15    Q    And does this show, as best we understand it, all of

16  the outgoing wires of Serv Trust to third parties, or at least

17  alleged third parties?

18    A    That is correct.

19    Q    Now, I'd like to look briefly at Exhibit 13, which is

20  a motion to intervene that was actually filed in this case.  If

21  you go a couple of pages in, you'll see there's a motion to

22  dismiss attached to that.  And if you go to page 7 in the

23  motion to dismiss, you'll see that it was signed by Mr. Myers.

24        THE COURT:  I guess, unfortunately, I have just three

25  pages of the motion to dismiss, if that's attached as a part of

51

1  13.

2          MR. VERSTANDIG:  Your Honor, may I --

3          THE COURT:  You may approach.

4          MR. PELLETIER:  I have an extra.  You can have my

5  copy.

6          MR. VERSTANDIG:  I won't admit I made these.

7          THE COURT:  That's all right.  I just have one, two,

8  three, and then --

9          MR. PELLETIER:  We have a copy you can have, Your

10  Honor.

11          THE COURT:  Oh, I see.  Okay.  I got it.  No, I got

12  it.  I got it.  It's just a blank page in here.  I thought that

13  was the next item, so I have it all.

14          MR. VERSTANDIG:  Okay.

15          BY MR. VERSTANDIG:

16      Q    And is this signed by Mr. Myers?

17      A    Yes.  This is signed by Mr. Myers.

18      Q    And what did he write about the signature?

19      A    Serv Trust, a Maryland statutory trust.

20      Q    Thank you.

21          MR. VERSTANDIG: Your Honor, Court's indulgence for a

22  moment.

23          THE COURT:  All right.  Sure.

24          MR. VERSTANDIG:  Making some slight --

25          BY MR. VERSTANDIG:



52

1    Q    Mr. King, did there come a time when Mr. Myers was
2    discharged as the manager of 6789 Goldsboro, LLC?

3    A    Yes.  January, yes.  At some point, we discharged
4    when I kind of felt that he was going to defraud.  I got the
5    impression that he was going to try to defraud me, which is
6    what I kind of felt.

7    Q    So had there previous to that been a time when the
8    class A members offered to buy Serv Trust interest in the
9    company as a means of giving Mr. Myers more money when the loan
10   stopped?

11   A    That is correct.

12   Q    And for how much money did the class A members offer
13   to buy Serv Trust's interest in the company at that point in
14   time?

15   A    Minus the advances, the loan, I mean, the buyout
16   number that he would've received at that point was right around
17   close to a million dollars.  I did that, I mean, I went through
18   that exercise just to kind of help him.  He was desperate for
19   money.  I didn't need to make him an offer, I didn't want to
20   give him an offer, but -- or not didn't want to, I did.  I just
21   felt it was going to help him get out of his bankruptcy if he
22   was able to get the monies earlier, but he didn't accept it.

23   Q    Now just for clarity, you said minus the advances it
24   would've been a million dollars.  So I understand the offer
25   would've been something in the neighborhood of $2 million and

53

1  Serv Trust would have to have repaid all the advances, and thus
2  would net it out something in the neighborhood of a million
3  dollars?

4      A    That is correct.

5      Q    And when this offer was made to Mr. Myers, was it in
6  or about September 2016?

7      A    That is -- September 2016.

8      Q    And was a finite period of time put on the offer?

9      A    Yes.  I gave him -- I put two weeks he had to accept
10  the offer in September 2016.

11     Q    And during those two weeks, did you receive an
12  acceptance of the offer from Mr. Myers?

13     A    I spoke to him multiple times and got some emails
14  from him during that time, and at no point did he ever say that
15  he was accepting the offer.

16     Q    Okay.  Now subsequent to those two weeks, did 6789
17  Goldsboro have certain meetings with zoning, planning or other
18  regulatory figures in Montgomery County?

19     A    Yes.

20     Q    Okay.  And can you describe generally what was
21  gleaned and learned during those meetings?

22     A    Before -- I'm sorry, before or after I made the
23  offer?

24     Q    After you made the offer and after the two weeks
25  elapsed where you didn't get an acceptance.

54

1    A    Yes.  I believe with Parks and Planning we had an

2  additional -- we had an October meeting, November meeting, and

3  December meeting.  And I believe that I was able to attend all

4  of those, having conversations with him in person.  And at

5  those meetings, we were moving forward with the zoning, trying

6  to get the, you know, change it from a single-family to a

7  multi, like 19-townhouse development.

8    Q    And if we go back and look at the operating agreement

9  which we'll cover, it actually contemplates 19 units as the

10  threshold for development in one of the sections, correct?

11    A    That is correct.

12    Q    Okay.  So I'm sorry, I didn't mean to cut you off.

13  You said you were trying to get approvals for 19 units and you

14  had these meetings with Parks and Planning?

15    A    Yes.

16    Q    What happened during these meetings?

17    A    Greg, as manager, was kind of making, you know, made

18  presentations with our development team.  At some point, and

19  after the December meeting -- and we never got any rulings from

20  Parks and Planning, we just got some guidance from them that by

21  the December meeting because the land sits on some slopes.

22  There's a creek that runs down the middle, and we were looking

23  to develop on one side of the creek that runs down the middle.

24  The Parks and Planning was having some issues with us doing the

25  development on some of the steep slopes.  So they were never --

1  they gave us some guidance that they weren't going to give us

2  the 19 units, and that's kind of the way those three meetings

3  kind of ended up is we never went any further with Parks and

4  Planning.

5      Q    Now, let's briefly detour and just talk about

6  exhibits, I believe it's 20, 21, and 22.  Are these

7  communications from the interim period between when your offer

8  to Mr. Myers expired and when negative news came from Parks and

9  Planning?

10     A    Yes.  This -- the first -- Exhibit 20 is a text

11 conversation that I had with Mr. Lynch, who was one of the

12 trustees.  And it was my impression from the meeting kind of

13 what happened, and my impression was that they were going to

14 shave off two to four units from the number that we were

15 asking.  I let them know that our breakeven was somewhere in

16 the -- around seven.  So I, you know, I let him know that we

17 had some room to give up from the development side, and he said

18 good news, and then fingers crossed.  And then at that point, I

19 just said FYI, I just got a call to revisit doing a buyout with

20 Mr. Myers.  He was looking for more dollars than I had

21 originally offered him for the potential units -- no, it's like

22 for potential units than what I had offered two months ago.  I

23 told him I'm not considering it at this time.

24     Q    And just to be clear because Mr. Myers' name is not

25 actually in the bottom text, Mr. Myers is the person referenced

1  when you say just got a call, correct?

2      A    That is correct.

3      Q    And at the top, it's a little bit cut off, but do I

4  understand this is from December 15, 2016?

5      A    Yes.  This was the text to Mr. Lynch.  I believe I

6  was driving home.  I was on my way back from the Parks and

7  Planning meeting that day.

8      Q    All right.  So after the initial offer to Mr. Myers

9  was made and expired, you're sharing with Mr. Lynch that Mr.

10  Myers has come back and is trying to negotiate different terms,

11  still pursuing a potential buyout?

12     A    The buyout that I had offered had a firm date on it,

13  two weeks after the September offer.  And I'm not sure what Mr.

14  Myers' impression was from this meeting.  Maybe he thought that

15  we were going to get more shaved off than two to four.  And

16  maybe some of his financial issues that he was having, which

17  was maybe a better thought was --

18          THE COURT:  Don't tell me what you speculate --

19          THE WITNESS:  Okay.

20          THE COURT:  -- as to what was going on.  Just tell me

21  what he said to you and what your responses were.

22          THE WITNESS:  The text says what my response was.  He

23  came back, tried to renegotiate the price, was asking for

24  additional funds over what I had offered him.  And --

25          THE COURT:  But did he make a firm request of you?

1  Did he say give me 1.5 million at this point?

2         THE WITNESS:  I don't recall at this point.

3         THE COURT:  Okay.

4         THE WITNESS:  I think if he would've given me a

5  number, I think he just wanted more money.

6         THE COURT:  Okay.  So the 2 million was not

7  acceptable to him at that point?

8         THE WITNESS:  That's -- that is correct.

9         THE COURT:  Okay.

10        BY MR. VERSTANDIG:

11    Q    Now after the deadline for the 2 million passed, and

12  after he asked for more money, do I understand correctly

13  Exhibits 21 and 22 sort of show him conducting business as

14  usual after the deadline to accept the 2 million had passed?

15    A    That is correct.  I mean, he was at the Parks and

16  Planning meetings in October, November, and December without

17  issue.

18    Q    Now at that December meeting, did Parks and Planning

19  have any sort of good news, bad news or impactful news as to

20  the potential of this project?

21    A    I'm sorry, can you say that again?

22    Q    Yes.  Did there come a time when Parks and Planning

23  told you you weren't getting 19 units?

24    A    That is correct, yes.

25    Q    All right.  Did there come a time when they suggested

58

1  it might be a much lower number?

2      A    Yes.

3      Q    All right.

4      A    It was sometime in mid-January.

5      Q    Okay.  And what was your understanding of what they

6  would approve?

7      A    My understanding was it was going to be the high

8  single digits -- the high single digits.

9      Q    Could I understand that to mean somewhere between 6

10  and 10?

11      A    That would be somewhere between six and nine.

12      Q    That's a good point; 10 is not a single digit.  Thank

13  you.  All right.  And after that, did there come a time when

14  Mr. Myers feigned to have timely accepted your original offer?

15      A    Yes.  I believe -- again, the date kind of slips me,

16  but I believe it was January 18th.  I got a very short, brief

17  email from Mr. Myers saying -- it probably said Brian, for me

18  to kind of paraphrase it, Brian, why didn't you close on the

19  offer that I gave you in October?  I accepted it.

20      Q    And without telling me anything that you said to your

21  lawyers, what did you do thereafter?

22      A    I immediately called my attorneys.  I had them draft

23  a letter Mr. Myers.  I fired him as a manager as I felt I was

24  being defrauded.  I contacted the development team, told them

25  Mr. Myers is, in writing, that Mr. Myers is no longer the

1 manager of 6789 Goldsboro.  I'd be taking over those

2 responsibilities.  And, yes, I think that's --

3     Q    All right.  And did there come a time when you

4 elected to exercise the class A -- or I should say the class A

5 members elected to exercise the class A members redemption

6 mechanism under the operating agreement?

7     A    So the way the operating agreement was written, it

8 was written for that three-year term.  I had --

9     Q    You can look at Exhibit 17, might be helpful here.

10    A    Yes.  Initially it was for a three year -- he had

11 three years to develop it as the manager.  After three years,

12 which was I think July of 2016, we were continuing to move

13 forward.  It wasn't until -- it wasn't until August of 2017

14 that we elected -- after, again, after I understood that he was

15 going to try to defraud me, I retained counsel and elected to

16 redeem the class B shares of Goldsboro.

17    Q    And Exhibit 18 is his email acknowledging receipt of

18 the letter from my firm triggering the redemption mechanism?

19    A    Serv Trust has received correspondence from you, from

20 the VerStandig Law Firm dated August 23, 2017.

21    Q    And I think he threatens to both suing and

22 (unintelligible) somewhere in there, correct?

23    A    That is correct.

24    Q    And ultimately you did have an appraisal completed,

25 correct?

60

1      A      Yes.  By Lipman, Frizzell & Mitchell.

2      Q      And that's the appraisal Exhibit 19, correct?

3      A      That is correct.

4      Q      And if we turn to, I believe it's page 5 -- I'm

5  sorry, page 3 of that document.  Do we see the appraised value

6  at 1 million to 1.325 million?

7      A      Yes.  The value that they came to was $1 to $1.325

8  million of the property.

9      Q      And then this is shown on Exhibit 4, which is for the

10  record, at this moment in time, August 17, 2017, had the class

11  A member's capital contributions exceeded $1.325 million?

12      A      Without looking back, they probably doubled that

13  number.  Well, maybe even more than doubled that number.  It

14  was much more at that point, it was a soft costs and loans out

15  to Mr. Myers.

16      Q      All right.  And did Serv Trust ever designate a

17  counter appraiser pursuant to the operating agreement?

18      A      In the operating agreement, they had -- the way that

19  I believe it was written, they had the opportunity to get their

20  own appraisal.  And if they were so far apart, then we would

21  even out to get the third appraisal, but yes.  We got our

22  appraisal, and Serv Trust had the opportunity to get an

23  additional appraisal for their number.

24      Q      And did they avail themselves to that opportunity?

25      A      They did not.

1    Q    Okay.  And to this day, the 3rd day of January of

2    2023, have you ever seen an appraisal of 6789 Goldsboro Road

3    from Serv Trust or Mr. Myers?

4    A    I have not.

5    Q    Thank you.

6        MR. VERSTANDIG:  Your Honor, I have no further

7    questions for Mr. King at this time.

8        THE COURT:  All right.  Anybody have any questions

9    for Mr. King?

10       MR. PELLETIER:  I do not, Your Honor.  I would start

11   my case unless Mr. Mastro has questions.

12       MR. MASTRO:  No questions, Your Honor.

13       THE COURT:  All right.  Let me just see if I have any

14   questions.

15       BY THE COURT:

16   Q    So the map of contributions against the value of the

17   property, the 1.325, you counted the loans to Mr. Myers as part

18   of the contributions of the King entities?

19   A    Yes.

20   Q    All right.  And since those loans were personal to

21   Mr. Myers, why were they counted as part of the project costs?

22   A    The way I was keeping my spreadsheets at the time, I

23   was keeping all the capital that I was putting into Goldsboro.

24   And I have the --

25   Q    But you knew --

1      A      -- I have the costs --

2      Q      -- you knew this wasn't going to Goldsboro.  I mean,

3  you knew that the reason that those payments were going to Mr.

4  Myers --

5      A      Well, the spreadsheet shows --

6      Q      -- to pay his personal expenses?

7      A      -- the money that was going -- the monies that

8  were -- I mean, I have it in other, I have it in -- well, in

9  this spreadsheet, if you take out the monies that went to Mr.

10  Myers minus the monies that were actually submitted to it,

11  those are the monies that were actually went to the soft costs

12  of the development.  And I have those in my Quicken program

13  of -- this spreadsheet just is a way to reconcile all the

14  monies that went in.

15      Q      I understand.  The question I have, and you're sort

16  of going to it is, excluding the loans to Mr. Myers, did the

17  King entities -- capital or cost contributions exceed $1.325

18  million?

19      A      Oh, yes.  Yes.

20      Q      Okay.

21      A      Yes.

22      Q      Then it makes it easy, so.  All right.  So I don't

23  have to determine whether that would be an appropriate number

24  to use for Mr. Myers' loans.  Okay.  Great.

25          MR. VERSTANDIG:  Your Honor, if I may?

1          THE COURT:  Do you have any questions based on my

2   questions.  Sure.

3          MR. VERSTANDIG:  Yes.  Let me, appreciating the last

4   point you made which I think takes care of the whole thing, but

5   let me try to clarify one thing.

6          THE COURT:  Okay.

7          BY MR. VERSTANDIG:

8      Q    When Mr. Myers would ask for money, would you lend

9   him the money or would 6789 Goldsboro lend him the money?

10     A    6789 Goldsboro was lending him the money.

11     Q    All right.  And 6789 Goldsboro, notwithstanding the

12  question I just asked, was really lending the money to Serv

13  Trust that was then giving it to Mr. Myers, right?

14     A    That is correct.

15     Q    And for 6789 Goldsboro to have the money to loan to

16  Serv Trust, would you, your wife, and your children's trust

17  have to put that money into 6789 Goldsboro?

18     A    Yes.  So that was the flow of money.  I put it -- I

19  didn't just write a check to him personally.  I put it into the

20  entity to keep track of it, and then 6789 Goldsboro then

21  distributed it and made those cash wires, checks out to either

22  Greg personally I think in one instance, but sometimes

23  directly -- sometimes to Serv Trust.

24     Q    All that notwithstanding, just to echo what the judge

25  just asked you, even if you put aside those loans, the capital

64

1   contributions by class A members still exceeded $1.35 million
2   on the date of the appraisal?
3          A     That is correct.
4                MR. VERSTANDIG:  Your Honor, nothing further.
5                THE COURT:  Okay.  All right.  What I'm going to do
6   is before we begin your case, we're right at 11:00, and that's
7   usually when we take a morning break.  We'll take 15 minutes,
8   let everybody stretch your legs, use the restroom, we'll come
9   back at 11:15 and we'll pick up then.
10               MR. PELLETIER:  Thank you, Your Honor.
11               MR. VERSTANDIG:  Thank you, Your Honor.
12               THE CLERK:  All rise.  Court stands in recess.
13               (Recess)
14               THE COURT:  Good morning again, everyone.  Please be
15  seated.
16               THE CLERK:  Back on the record.
17               THE COURT:  All right.  All right.  I'm happy to hear
18  your case.
19               MR. PELLETIER:  Thank you, Your Honor.  Eric
20  Pelletier for 6789 Goldsboro, LLC, calling, or continue on the
21  examination with Mr. King.
22               THE COURT:  Okay.  All right, Mr. King, just remember
23  you're still under oath.
24               THE WITNESS:  Okay.
25               THE COURT:  Okay.

1                    CROSS-EXAMINATION

2           BY MR. PELLETIER:

3      Q    Mr. King, for the record, you're here as 6789

4  Goldsboro, Goldsboro, LLC's corporate designee?

5      A    I am.

6      Q    And do you have a title with the company currently?

7      A    Manager.

8      Q    Okay.  How long have you been manager?

9      A    Since January 2017.

10     Q    Okay.  And looking back in exhibit, at an exhibit you

11  saw this morning as promised, it's Exhibit No. 5, Exhibit No. 5

12  in the materials that Mr. VerStandig showed you.

13     A    Uh-huh.

14     Q    Do you recognize that document?

15     A    It's a promissory note that I signed with Serv Trust.

16     Q    Okay.  And who is the borrower, just to be clear?

17     A    Serv Trust of Maryland statutory trust.

18     Q    Okay.  And the holder of the note is 6789 Goldsboro?

19     A    Yes.

20     Q    And that's a true and accurate copy of the note and

21  so forth?

22     A    Yes.

23     Q    And whose initials are on the bottom of each page of

24  the note?

25     A    Greg Myers.

66

1       Q     How do you know that?

2       A     I have seen those initials before.

3       Q     Okay.  Now Section 1 of that exhibit, Exhibit 5,

4    Plaintiff's Exhibit 5, lists prior advances.  So, can you

5    explain to me what is meant by the term prior advances?

6       A     When we were kind of working together, we did not,

7    this, this note, promissory note was made in 2015.  From the

8    start of the business relationship, he had come to, come and

9    asked me for advances; and in, May 2015, we kind of

10   memorialized all the promissory, all the loans that were made

11   out to, that served 6789 Goldsboro made to Serv Trust.

12      Q     Okay.  And those are reflected in Exhibit 1?

13      A     That is correct.

14      Q     Section 2 refers to future advances.  What, can you

15   explain to me what is meant by future advances?

16      A     I understood at the time that these loans that were

17   being made out to him were not going to, were not going to

18   stop.  So, we, any additional advances, advances that we made

19   in the future were, would be covered under future advances.

20      Q     Okay.  And did you keep track of the future advances?

21      A     I did.

22      Q     Okay.  I'm going to refer you to, well, how did you

23   do that?

24      A     Through a spreadsheet.

25      Q     Okay.  Now if you could refer to the white notebook

 1  which are my --

 2      A    Yeah.

 3      Q    -- my exhibits?  Under Tab 3, they're misnumbered,

 4  but it's Exhibit 24.

 5      A    Yes.

 6      Q    Do you recognize that?

 7      A    Yes. it's a portion of a bigger spreadsheet that I

 8  keep.

 9      Q    Okay.  And can you just walk us through what is shown

10  on Exhibit 24?

11      A    Yes.  This is the loans that 6789 Goldsboro made to

12  Serv Trust after the closing.  So, you can see the original on,

13  the original portion of these notes have, these loans started,

14  an origination date of February 27, 2014, and they go the whole

15  way up to August of 2016 with, this, this spreadsheet is

16  current up to January 1, 2023.  So, you can see the days

17  outstanding, the principle that was advanced, 635; the interest

18  due; and the principle and interest at the end of, which is the

19  total.

20      Q    Now just to be clear, if you could refer back to the

21  promissory note which is in front of you at Exhibit 5, was

22  there a, a maturity date under that note?  I believe it's on

23  page 2.

24      A    The maturity date is December 31, 2017.

25      Q    Okay.  Now just going back to the exhibit I had just

1  shown you, Exhibit 24, there's an entry here, the second column

2  says, "Due date," on Exhibit 24; and it says, January 2, 2023,

3  can you explain why you used that date, what, what the date was

4  used for on this exhibit?

5      A    That date is to calculate the interest outstanding.

6  So, each of these loans were, like let's take the first loan

7  and it's $400,000.  There's, the difference between the, the,

8  the 2014 date and the 2023 date is 3,230 days.  So, it's simple

9  interest on a principle of $100,000.  There's $89,000 of

10  interest, approximately $89,000 worth of interest due, and

11  principle and interest is the last column.

12      Q    Okay.  And just to clarify, and I'm sorry I'm hopping

13  back between exhibits, but back to page 2 of Exhibit, of the

14  promissory note, Exhibit 5, does, does this note provide for

15  when interest starts to be calculated and how?

16      A    Yes, it --

17      Q    What section, sir?

18      A    It is interest, Section 3.

19      Q    Uh-huh.  And when does interest commence?

20      A    It commences on the, when they, when the loans were

21  actually made to Serv Trust.

22      Q    Okay.  So, going back again to the spreadsheet, the

23  days outstanding --

24      A    Yes?

25      Q    -- what, what does that column reflect now?

69

1       A      The number of days since the loan was made.

2       Q      Okay.  And just going through the rest of the

3   columns, do we know what the principle is?  Well, actually, why

4   don't you explain what's listed in the principle column.

5       A      In the principle column, it's, these are, these are

6   funds that were either written, or sent to Serv Trust or Mr.

7   Myers directly for 600, for a total of $635,000 in, in loans

8   that were made after closing.

9       Q      Okay.  So, so, each of these, each of these entries

10  in the column titled principle is an amount of a loan made

11  under the note?

12      A      Correct.

13      Q      Okay.  And what's the next column over?

14      A      Interest due on, on the principle for that individual

15  loan.  So, I kept track of them individually because that's the

16  way it was done in the promissory note.

17      Q      And the final column?

18      A      It just adds those, the principle and interest due

19  together to give you --

20      Q      Per loan, for each loan?

21      A      For each loan.

22      Q      Okay.

23      A      Correct.

24      Q      Now going down to the bottom in bold, what is the

25  principle interest and principle and interest combined total of

70

1  each?

2      A    $1,134,937.50.

3      Q    And you kept this in, in a, in the usual course of

4  6789 Goldsboro's business?

5      A    Yes.

6          MR. PELLETIER:  We'd move this Exhibit No. 24 into

7  evidence, Your Honor.

8          THE COURT:  All right.  Plaintiff's 24 is received,

9  or, yeah, the plaintiff.

10         MR. PELLETIER:  Is it 24?  It should be --

11         THE COURT:  6789 Goldsboro's 24 is received, which is

12  Plaintiff's 24 is received.

13                            (The item marked for

14                             identification as Plaintiffs'

15                             Exhibit No. 24 was received in

16                             evidence.)

17         MR. PELLETIER:  Thank you, Your Honor.

18         BY MR. PELLETIER:

19     Q    And just for point of clarification, Mr. King, I'm

20  going to show you, now it's lost in the, in the papers here on

21  our table.  I'm going to show you what's been marked and the

22  Judge has it exhibit, as Exhibit 27.  Do you recognize what

23  Exhibit 27, which may be tucked in the very back pocket --

24     A    Yeah.

25     Q    -- okay?  Do you recognize what that is, sir?

1    A    It's kind of the, the bigger spreadsheet that gives

2  all the details.

3    Q    Well, first, just answer the question.

4    A    Yes.  Yes.

5    Q    Do you recognize this?

6    A    I do.

7    Q    Okay.  Who, who compiled this?

8    A    I, I do.

9    Q    And how current is this document?

10    A    As of January 1, 2023, its current.

11    Q    Okay.  And I can't remember the exhibit number of the

12  one that Mr. VerStandig put in, but is this merely, of Exhibit

13  4, is this an update to Exhibit 4, just to bring current?  It's

14  a little bit different printed format, but --

15    A    Yeah.  The copy that Mr. VerStandig had was, was May

16  14, 2018.

17    Q    And it was calculated as of that date because trial

18  was supposed to happen at that time?

19    A    Yeah, I, yes.

20    Q    Okay.

21    A    I'm assuming, yes.

22    Q    Okay.  And just looking at the freestanding Exhibit

23  27, it's in my hand, the very last page, and there's printed

24  pages, is that correct, sir?

25    A    That's correct.

72

1      Q     The very last page has the loans to Serv Trust and
2   I'm just doing this for housekeeping purposes.  The section
3   that's titled on page 3 of Exhibit 27, loans to Serv Trust, is
4   that the same thing as what we just introduced into evidence,
5   Exhibit 24?

6      A     That is correct.

7           MR. PELLETIER:  Did Your Honor follow that?  I don't
8   want to confuse the record.

9           THE COURT:  Yeah.  Yeah, I have it the 630 was to
10  Serv Trust.

11          BY MR. PELLETIER:

12     Q     So, sir, what is the total amount of principle and
13  interest that, under the promissory note per se that Goldsboro
14  was seeking from Serv Trust today?

15     A     The 635, plus the interest, which would be the $1.134
16  million and change.

17     Q     Okay.  And so, just to be clear, all these loans have
18  actually funded?

19     A     They have.

20     Q     Has any of, any of the, have any of these loans been
21  repaid at all?

22     A     There has been no repayment of either principle or
23  interest as of today.

24     Q     Sir, does the promissory note allow for recovery of
25  attorneys' fees?

1      A    It does.

2      Q    I'm going to ask you to turn to, in the white

3  notebook, if you could, to Exhibit 23.  Do you recognize

4  Exhibit 23?

5      A    These are invoices from Offit Kurman.

6      Q    Okay.  And is, have these invoices been paid?

7      A    Yes.

8      Q    Okay.  Now just to be clear, you said invoices.  If

9  you could turn to the very last page of Exhibit 23?  That page

10 is not an invoice, is that correct, sir?

11     A    That is correct.

12     Q    And what's your understanding of what that very last

13 page is?

14     A    These are, these are billable charges that will be

15 billed on the January bill.

16     Q    Thank you, sir.  And with respect to everything else,

17 the invoices, these are true and accurate copies of invoices

18 that you've actually received from Offit Kurman?

19     A    Received and paid.

20     Q    Received and paid?

21          MR. PELLETIER:  Your Honor, I'd offer Exhibit --

22          THE WITNESS:  Except for this --

23          MR. PELLETIER:  -- I'll offer Exhibit 23 into

24 evidence.

25          THE COURT:  All right.  Plaintiff's 23 is received.

74

1                              (The item marked for

2                              identification as Plaintiffs'

3                              Exhibit No. 23 was received in

4                              evidence.)

5          BY MR. PELLETIER:

6     Q    And Exhibit 23 itemizes all the time entries for time

7  spent by each person rendering billed services, is that right?

8     A    That is correct.

9     Q    Okay.  What do you do for a living, sir?

10    A    I own and develop real estate.

11    Q    And during the course of your development and

12 management, and develop, real estate management and development

13 business, do you employ the services of attorneys?

14    A    Yes.

15    Q    How often?

16    A    Very often.

17    Q    In the, in, where does your business operate, what

18 state?

19    A    Maryland.

20    Q    And can you just describe for me what, through the

21 course of your business, what your interactions are with your

22 attorneys, what kind of services do you seek from them?

23    A    If I'm, if I'm closing on a deal, it would be real

24 estate attorney.  If I'm doing, somebody reviewing my lease, it

25 would be, it just depends.  I mean I have a lot of facets of

1  owning and managing a business.  So, it could be human

2  resources.  It could be estate.  It could be real estate.  It

3  could be litigation.

4       Q     And do you, do you have an opinion on the issue of

5  whether or not the attorneys' fees of 6789 Goldsboro has been

6  charged, i.e., Exhibit 23, what's shown in Exhibit 23, do you

7  have an opinion on whether or not those fees are fair and

8  reasonable?

9            THE COURT:  How can he opine to that?

10           MR. PELLETIER:  Your Honor --

11           THE COURT:  Usually, I give, I'll give an attorney --

12           MR. PELLETIER:  And we're prepared --

13           THE COURT:   -- an affidavit or something along those

14  lines.

15           MR. PELLETIER:  We, we could do that.  We're prepared

16  to do that, but to answer your question directly, there's a

17  case on point.  It's Zachair v. Driggs.

18           THE COURT:  Okay.

19           MR. PELLETIER:  And it says a lay person can render

20  an opinion on attorneys' fees and the reasonableness, like a

21  lay opinion in like a conversion case in some sense --

22           THE COURT:  Okay.

23           MR. PELLETIER:  -- it's a lay opinion.  And also,

24  Your Honor, I think this falls under one of those cases where

25  it's an element of damages.  So, it would be for the Court to

1  opinion on anyway.

2          THE COURT:  Well, it is, I mean I'm not sure if it,

3  you know, I was looking at it under here in the collection, it

4  says in event of it falling apart, it needs to pay the holder

5  reimbursement upon fees.  And, you know, it's unclear as to

6  whether it's an action of damages or whether it's you're

7  entitled to get your fees afterwards which you would get in

8  terms of, under the rule.  It sets forth the, you know, the

9  analysis that I have to go through under --

10          MR. PELLETIER:  Well --

11          THE COURT:  -- the 2-700 rules.

12          MR. PELLETIER:  Yeah, the 2-700 rules.  So, I will

13  admit my weakness in understanding the one that is prevailing

14  party versus --

15          THE COURT:  Right.

16          MR. PELLETIER:  -- versus element of damages.

17          THE COURT:  Right.

18          MR. PELLETIER:  To me, my, my thinking was this is an

19  element of damages because it just doesn't say the winner or

20  the prevailing party gets the fees; but, in any event, we're

21  able to put on Mr. Wilburn who can opine on it.  We can go

22  through the reasonableness --

23          THE COURT:  Okay.

24          MR. PELLETIER:  -- factors.

25          THE COURT:  All right.  Well, let him opine since he

77

1  started the case.

2          BY MR. PELLETIER:

3      Q    So, sir, do you have an opinion on whether or not the

4  bills rendered to you by Offit Kurman to, you know, represent

5  you in this matter are fair and reasonable?

6      A    Yes, sir.  They seem reasonable to me.

7      Q    And so, sir, if you could turn to Exhibit 25 in the

8  white notebook, if you have it, Exhibit 25, is it numbered for

9  you, sir?

10     A    Yes, it is.

11     Q    What's the title of that document at the very top?

12  There are some numbers.

13     A    A client number with 6789 Goldsboro dispute with Serv

14  Trust.

15     Q    Okay.  And have you seen this before?

16     A    Yes.

17     Q    What is it?

18     A    It is the, the bills that, that, that I received and

19  paid, or you could, and paid, total billed fees, fees billed,

20  hard costs, soft costs and total A&R.

21     Q    Okay.  So, this is a tally of the bills, plus the

22  whip, which is the last page of Exhibit 23?

23     A    Yes, this does include the unbilled part.

24     Q    Okay.

25          MR. PELLETIER:  We'd move, we'd offer Exhibit 25 into

1  evidence, Your Honor.

2          THE COURT:  All right, 25 is received.

3                              (The item marked for

4                              identification as Plaintiffs'

5                              Exhibit No. 25 was received in

6                              evidence.)

7          BY MR. PELLETIER:

8      Q    If you could turn to Exhibit 26, sir?  Do you

9  recognize that document?

10     A    Yes.

11     Q    It's titled, total amount due and owing.  Can you

12 explain to me what's reflected on that exhibit?

13     A    This is the principle of the promissory note that we

14 looked at earlier, the interest due and the attorneys' fees

15 that I've incurred for a total of $1,264,737.76.

16     Q    And you were seeking that as part of a judgment

17 against Serv Trust today?

18     A    Yes.

19     Q    Did 6789 loan additional sums beyond the amounts

20 we've just discussed?  Did it loan additional sums to Serv

21 Trust?

22     A    Yes.

23     Q    How much?

24     A    $300,000 at closing.

25     Q    Okay.  And, and I think you said that was, what, 2013

79

1  or 2014?

2      A      2013 at the closing, so it happened in July of 2013.

3      Q      And just to sort of clarify things, when you're

4  referencing the closing, what was the closing, the closing for?

5      A      The closing was when 6789 bought the property at 6789

6  Goldsboro Road.

7      Q      Okay.  And what was the $300,000 loaned related to?

8      A      It was a loan made to Serv Trust so that they could

9  make a capital contribution into the, into the company.

10     Q      And so, if, and I lost you.  I think, if you could

11  just turn to in the black notebook Exhibit 1, which is the

12  first-amended and restated operating agreement --

13     A      Yes.

14     Q      -- of Goldsboro.  Are the capital contributions

15  reflected in that document?

16     A      Yes, they are, on, I think, the third to last page.

17  It shows the initial, the third column is initial capital

18  contributions as of July 18, 2013; and the last, the Class B

19  members contribution was $306,192.  And this, the Serv Trust

20  had already invested $6,192 into this and my, they were able to

21  add the $300,000 loan that I made to Serv Trust.

22     Q      The 6789 made to Serv Trust?

23     A      That 6789 made to Serv Trust and that's how they got

24  to the $306,192.

25     Q      Okay.  Did that, did that $306,192 remain in 6789

80

1  Goldsboro's operating accounts?

2      A    No, that was immediately distributed out to Serv

3  Trust at closing.  I think it was wired at closing.

4      Q    So, the capital contribution came back out?

5      A    Yes.

6      Q    And what was your understanding of the terms of, of

7  how that $300,000 was going to be repaid?

8      A    That would be repaid at closing.

9      Q    Closing on what?

10     A    When, if we, if we ever, I'm sorry, so if we ever

11 sold the property, the $300,000 would be, would, would,

12 depending on how the waterfall, I forget exactly what the

13 waterfall is, but it would be deducted from the capital account

14 of, of Serv Trust, the Class B member at that time prior to, as

15 the closing statements were, were made up.

16     Q    Has that $300,000 been repaid to date to 6789

17 Goldsboro?

18     A    No, it has not.

19     Q    And in allowing that money to come out of Goldsboro's

20 account, what was your, did you rely on the, strike that.

21 There was a promise of repayment of that sum?

22     A    Yes.

23     Q    Did you rely on that in making the loan?

24     A    Yes.

25     Q    And do you, do you here today, you meaning you as a

 1   managing member of 6789 Goldsboro, LLC, seek that as part of

 2   the recovery in this case against Serv Trust?

 3       A    Absolutely, yes.

 4            MR. PELLETIER:  If I can have your indulgence, Your

 5   Honor?  I'm just going to look at my notes if I can find them,

 6   Your Honor.

 7            BY MR. PELLETIER:

 8       Q    Sir, would you have allowed, excuse me, would you

 9   have allowed Serv Trust to withdraw that sum from 6789's

10   account with, if, if you understood that it would not be

11   repaid?

12       A    No.

13       Q    And it hasn't been paid to date?

14       A    It has not.

15            MR. PELLETIER:  Your Honor, I have no further

16   questions.

17            THE COURT:  Do you have any questions?

18            MR. VERSTANDIG:  Your Honor, I have one question.

19            THE COURT:  Okay.

20                      REDIRECT EXAMINATION

21            BY MR. VERSTANDIG:

22       Q    During the course of your various dealings in your

23   capacity as a manager of 6789 Goldsboro, did you come to learn

24   the name of Mr. Myers' spouse?

25       A    Barbara Ann Kelly.

1      Q      Thank you.

2             MR. VERSTANDIG:  Nothing further.

3             THE COURT:  Okay.  Do you have any --

4             MR. MASTRO:  No questions, Your Honor.

5             THE COURT:  All right.  I have a couple questions.

6             BY THE COURT:

7      Q      Has the, has the property, 6783, been sold?  Have you

8  sold, has, has, has the property at issue or at 6789 Goldsboro,

9  has that been sold?

10     A      No.

11     Q      Okay.  If, if the interest is redeemed, what does

12 that do to the claim for the $300,000?

13     A      I'm sorry?

14     Q      I'm just trying to see, you're trying to redeem his,

15 his claim, or his equity interest, and then you're also seeking

16 to recover that interest from him.  I'm trying to figure out,

17 are you, is that, are you double-dipping in a sense?

18     A      The $300,000, if in the spreadsheet --

19     Q      You made, you, you lent money to Serv Trust.  Serv

20 Trust then makes a capital contribution?

21     A      Yes.

22     Q      And then for your sake, is it then immediately sent

23 out, that capital contribution back to Serv Trust?  So, in

24 essence, I mean I, it looks illusory to me that there's any

25 actual capital contribution from Serv Trust at all in this

1    endeavor.  I mean what you're putting on your books and putting

2    out to the public is that there's a $300,000 contribution from

3    Serv Trust but, in essence, there isn't.

4        A    No, that the monies went straight out to Mr. Myers at

5    closing.

6        Q    Okay.  So, when Mr. Myers --

7        A    So, they, they never --

8        Q    -- directly?

9        A    To Mr. Myers, well, to Serv Trust.

10       Q    All right.

11       A    And --

12       Q    I mean it, it, I mean it looks like a shell game.  It

13   looks like money goes in and money comes right back out.

14       A    Well, I, for my purposes, I would put, I would infuse

15   capital into the property --

16       Q    Uh-huh.

17       A    -- and then I would have the property lend money to,

18   to Mr. Myers.

19       Q    All right.

20       A    It was either to lend money to Mr. Myers or pay for

21   soft costs.

22       Q    But, but I understand that's on the loans, but I'm

23   trying to, this is a capital contribution, what you're carrying

24   on your books is a capital contribution which Serv Pro is

25   purported to make and that's fine, you make a loan of $300,000

84

1  to Serv Pro and Serv Pro signs a promissory note and then they

2  put the money in this capital; but then they don't do that.

3  There's, there's no documentation as I've seen; and then the

4  money just goes right back to Serv Pro, Serv Trust. So, I mean

5  it's not really a capital contribution at all. Their

6  contribution to me seems to be $6,192. And I'm just trying to

7  figure out why, why, why are we going through the hoops to do

8  that in this transaction?

9  A    Well, I lent the money, the $300,000 to Serv Trust at

10  the beginning and that money is --

11  Q    But there was no note or anything at that time?

12  A    I believe it was covered in the operating agreement.

13  Q    Okay.

14  A    I'm sorry, the first-amended restated operating

15  agreement. So, initial capital contributions in Section 3.2.1

16  goes over the buying of the property and then, again, the, how

17  the money flows in and out because of the language of the

18  document, it's very, I need an attorney to kind of interpret

19  it.  But it's, it states in there how the monies --

20  Q    Yeah, but they're saying, I mean it's defined as a

21  gross asset value of the regional sales contract for the

22  purpose of the property, $300,000. So, it's characterized as,

23  it looks like some type of payment out to, acknowledges some,

24  some value they received for sort of a finder's fee. That's

25  fine. I, I can certainly ask counsel if they can try to

1  describe to me how the payment was made and why it's due, and
2  what the interaction between redeeming their interest and then
3  seeking repayment of that money.  All right.  Anything else?
4  Any questions based on my questions?
5        MR. PELLETIER:  I have no questions based on your
6  questions, Your Honor.
7            (Witness excused.)
8        MR. PELLETIER:  I would just move in the Exhibits 23
9  to, I think it's 27, Plaintiff's, 6789 Goldsboro's.
10       THE COURT:  All right.  THE COURT:  To the extent we
11 haven't admitted 23 through 27, I'll receive.  I did have an
12 extra copy of the last exhibit that was in here.
13       MR. PELLETIER:  I can come up and get it when, when,
14 when you tell me to.
15       THE COURT:  Didn't need to scan it twice.  I don't
16 know how we're going to scan it.  It's over-sized, so, so,
17 we'll --
18       THE CLERK:  I'll figure it out.
19       THE COURT:  Well, all right.  All right.
20                        (The items marked for
21                         identification as Plaintiffs'
22                         Exhibit Nos. 26, 27 were received
23                         in evidence.)
24       MR. PELLETIER:  Your Honor, and if Your Honor is
25 willing to hear, we would put on Ms. Wilburn as, on evidence of

1  attorneys' fees.

2         THE COURT:  Yeah, I think it's probably appropriate

3  just to make sure that there's a basis for the charges and the

4  reasonableness of the fees, and the amount, and -- she was

5  never sworn.

6                          FRANCES WILBURN

7  called as a witness on behalf of the plaintiffs, having been

8  first duly sworn, was examined and testified as follows:

9         THE COURT:  All right.  You can have a seat and make

10 yourself comfortable.

11        THE WITNESS:  Thank you, Your Honor.

12                      DIRECT EXAMINATION

13        BY MR. PELLETIER:

14    Q   Ms. Wilburn, where were you on the night of -- I've

15 always wanted to do that.  I've had it done to me.  So, if you

16 could state your full name for the record?

17    A   Frances C. Wilburn.

18    Q   And what do you do for a living?

19    A   I am an attorney with the law firm of Offit Kurman.

20    Q   And when you say you're an attorney, what, what state

21 bars are you, have you been licensed by?

22    A   Yes, I am admitted to practice in the Commonwealth of

23 Virginia since 2008, the state of Maryland since January of

24 2008 and the District of Columbia since 2008.

25    Q   And can you explain to me what type of law you

87

1    practice?

2        A    Yes, I would characterize it as commercial

3    litigation.   The majority of my cases deal with breach of

4    promissory notes, breach of leases, breach of contracts and

5    I've appeared in, before this Court over a hundred times.

6        Q    This court meaning the circuit court, as opposed to

7    this, Your Honor, Judge Lease?

8        A    Correct.

9        Q    Right.   But you've appeared in front of Judge Lease?

10       A    I have

11       Q    Have you had a chance to go through what's been

12   marked as Plaintiff's Exhibit 23 in this case which is the

13   bills and WIP from Offit Kurman?

14       A    Yes, I have.

15       Q    And before we get into that, can you give me your

16   general description of what this case -- strike that.   Have you

17   been involved in representing, excuse me, 6789 Goldsboro, LLC,

18   since the inception of this case or very close to it?

19       A    Yes.   I became involved in late fall of 2018.   I was

20   involved in drafting pleadings.   This case involves the

21   collection and the pursuit of remedies under a promissory note

22   and hopeful collection.   I took the deposition of Mr. Myers.   I

23   prepared for the deposition.   There were various motions,

24   dispositive motions.   There are dueling bankruptcy proceedings

25   and we were monitoring those to see what the status of the

1  bankruptcy would do to our case, 6789's case.  We prepared for

2  this trial.  We prepared our witnesses.  We reviewed and

3  advised on motions that were filed as recently as, by Mr. Myers

4  as recently as Friday.

5      Q    And, and part of that representation included filings

6  in the bankruptcy court?

7      A    Yes.

8      Q    Okay.  That's the Maryland Bankruptcy Court?

9      A    Correct, including our proof of claim.

10     Q    So, Ms. Wilburn, you said you've been practicing law

11 in the state of Maryland for 13 years?

12     A    Yes.

13     Q    And have you ever opined as to attorneys' fees

14 previously?

15     A    I have never been qualified as an expert to opine on

16 attorneys' fees.

17     Q    And have you reviewed bills for attorneys' fees from,

18 during the course of your practice?

19     A    Yes.

20     Q    And are, have you revealed, reviewed bills for

21 attorneys' fees for firms other than Offit Kurman?

22     A    Yes.

23          MR. PELLETIER:  Your Honor, I'd move to have Ms.

24 Wilburn qualified as an expert on the issue of attorneys' fees.

25          THE COURT:  All right.  I'll receive her as an expert

1    on the issue of attorneys' fees.

2              BY MR. PELLETIER:

3        Q    So, Ms. Wilburn, you've had a chance to review the

4    bills that are listed in Exhibit 23 of plaintiffs' exhibits?

5        A    Yes.

6        Q    And do you have an opinion as to whether or not those

7    bills are reasonable?

8        A    Yes.  My opinion is that the bills are fair and

9    reasonable.  The hourly rates charged by each attorney are fair

10   and reasonable.  The amount of time and labor required by this

11   case necessitated the time and expense that the attorneys from

12   Offit Kurman provided.  This, these are fees that are

13   customarily charged in this area.  This case has been pending

14   since, Offit Kurman has been involved in the case for four

15   years due to the duration of time.  I think that the total

16   charges are very fair and reasonable and I think the

17   experience, reputation and ability of myself and Mr. Pelletier

18   dictate that the attorneys' fees are fair and reasonable in

19   this instance.

20       Q    So, I, I suspect you're laughing as to my

21   qualifications, but that's okay. As far as the, the, the tenor

22   of the opponent and the litigiousness of the opponent, does

23   that factor into your opinion at all?

24       A    Yes, it does.

25       Q    How so?

1    A    Mr. Myers has filed multiple motions in this case,

2  multiple bankruptcies, sent multiple emails to counsel over the

3  last four years and I think that has definitely played impact

4  on the total amount of the attorneys' fees in this case and our

5  responses, I think, were fair, reasonable and necessary.

6    Q    And, and what about the timing of Mr., Mr. Myers'

7  filings of motions in this case, can you, can you characterize

8  that?

9    A    They were typically done at the last minute.  We were

10  all scrambling to try to file out-of-court responses.

11         MR. PELLETIER:  Your Honor, I have no further

12  questions.  I believe Ms. Wilburn has opined as to the

13  reasonableness of these fees, unless Your Honor has some

14  questions of her.

15         THE COURT:  Just a quick question.

16         BY THE COURT:

17    Q    In terms of the rates that, that are charged, do you

18  find that his rates are customary among attorneys of similar

19  backgrounds in the Montgomery County area?

20    A    Yes, I do.

21    Q    And in looking at the bills when you reviewed them,

22  did you review to see if there was any overlap with anything

23  that the King defendants were doing in the case such that work

24  that was done could have simply ben piggybacked on their

25  filings?

1     A    I did review that and I also compared it to the

2  docket, which I printed out and reviewed, and I found that

3  there was no overlap.

4     Q    Okay.  All right.  Thank you.  Any questions --

5     A    Thank you.

6     Q    -- based on my questions?  I should ask counsel --

7           MR. MASTRO:  No, Your Honor.

8           THE COURT:  -- if you had any questions?

9           MR. MASTRO:  No, Your Honor.

10          THE COURT:  All right.  All right.  Thank you.

11          MR. PELLETIER:  Thank you, Your Honor.

12          (Witness excused.)

13          THE COURT:  So, that's the plaintiffs' case, second

14  case, I would guess.  No additional witnesses?

15          MR. PELLETIER:  No witnesses from me, Your Honor.

16          THE COURT:  All right.  All right.  So, unless you

17  have any type of rebuttal --

18          MR. VERSTANDIG:  Your Honor, to the extent we

19  haven't, I guess, retract, we would rest.  We have not rebuttal

20  today.

21          THE COURT:  Okay.  So, we'll rest.  I'll note that

22  the exhibits, I think all exhibits have been admitted at this

23  point.  So, I'll take, everyone, how long do we think we want

24  to argue?

25          MR. VERSTANDIG:  Your Honor, I'm going to have one

1  motion before argument which will take about 30 seconds.

2          THE COURT:  Okay.

3          MR. VERSTANDIG:  And then I anticipate my closing

4  will be 10 minutes, which in my experience means it will be 25

5  minutes.

6          THE COURT:  Okay.  All right.

7          MR. VERSTANDIG:  And we'll --

8          THE COURT:  All right.  And there's, I'm just trying

9  to think.  I think we can get it in before lunch if we, maybe

10  I'd love to shoot, and then I'll adjourn for lunch at 1 o'clock

11  if we don't have it, finished it up at that point, all right?

12          MR. VERSTANDIG:  Your Honor, if, at this time if all

13  parties have resented pursuant to Maryland Rule 2-519, we move

14  for judgment as a matter of law on the affirmative claims for

15  the Serv Trust, I'm sorry, brought by Serv Trust.  There's no

16  evidence to support any of the claims as annunciated in the

17  most recent pleading by Serv Trust; and to the contrary, the

18  uncontradicted records reveals that the core assertion

19  underlying those claims, mainly, that the buyout agreement was

20  properly contradicted $1 million is fictitious, fraudulent and

21  belied by fact.  Accordingly, we ask for judgment as a matter

22  of law to Serv Trust's claims brought on the (unintelligible).

23          THE COURT:  Had they filed an amended complaint?

24          MR. VERSTANDIG:  Yes, I can tell you what the

25  operative pleading is if you give me a second.  There is a

1  second-amended counterclaim that was docketed January 10, 2019.

2          THE COURT:  January 10, 2019?

3          MR. VERSTANDIG:  Yes.

4          THE COURT:  All right.  All right.  So, does anyone

5  else want to be heard?

6          (No affirmative response.)

7          THE COURT:  Just to make it short, okay, on that

8  motion?

9          MR. PELLETIER:  I, I don't have, I don't.

10          THE COURT:  Because I don't know if, if their claims

11  went to your claim also.

12          MR. PELLETIER:  We would move for, affirmatively on

13  our claim.  I don't think there's any dispute of fact.

14          THE COURT:  Because I thought it was, I'm not sure if

15  it did or not, but it may have been all included in the sense

16  that they were, your claims were supposed be paid from that.

17  So, based upon the fact that Serv Trust has failed to appear,

18  or failed to present any evidence in support of its

19  counterclaim, the second-amended counterclaim, which was filed

20  on January 10, 2019, I'll grant the motion for judgment given

21  the fact that there's lack of any evidence to support it.

22          Moreover, I would note that the evidence that was

23  presented in court, that on a motion for judgment in a bench

24  trial the Court is allowed to make factual findings.  It is not

25  required to look at the case in the light most favorable to the

1  party.  We would note that the facts as presented in this Court
2  suggest that the basis for the underlying claims that there was
3  an affirmative acceptance, a timely acceptance of the offer is,
4  I just simply don't find that to be accurate and, and it
5  appears to be a bit manufactured.

6          MR. VERSTANDIG:  Thank you, Your Honor.

7          THE COURT:  All right.

8          MR. VERSTANDIG:  Your Honor, if I may be heard in
9  closing?

10         THE COURT:  You may.

11         MR. VERSTANDIG:  Thank you.

12             CLOSING ARGUMENT BY MAURICE VERSTANDIG, ESQ.

13                 ON BEHALF OF THE PLAINTIFFS

14         MR. VERSTANDIG:  Your Honor, we are down to two
15  issues as it concerns my clients.  The first is the alter ego
16  issue referenced in our opening and the second is the
17  redemption issue referenced in our opening.

18         Because we moved the exhibits cumulatively, and while
19  Mr. King did speak to some of the things in there, we never
20  necessarily got into the meat, I'd like to walk through some of
21  what is contained in our binder in the examination review.

22         And I'll start with the myriad of checks and wire
23  transfers from Serv Trust, Joint Exhibits 11 and 12.  If the
24  Court were to sit down and scrutinize every single page of
25  those exhibits, the Court would discover that during the

1    relevant time period, which is the only time period for which

2    we have records which would share specific dates, $1.371

3    million and change exited Serv Trust accounts.  And of the

4    $1.371 million and change, $783,150 went to Gregory B. Myers.

5    And I don't mean indirectly.  I mean either the check was made

6    to him or the wire went to him.  $434,525 went to Barbara Ann

7    Kelly, who was identified in evidence as Mr. Myers' wife.

8    16,825 went to various courts.  $16,713.33 went to legal fees

9    and my favorite, $4,911.73 went to country club dues.

10            And I also want the record to show, though, that

11   we're being candid and our contention is that this was from Mr.

12   Myers, and by extension his wife, and wasn't really for his

13   children.  I will tell you that if you sat down and looked at

14   everything, you would see there are $64,527 in distributions

15   for the children's schools and housing based upon the

16   memorandum lines on the checks and the reasonable extrapolation

17   of the parties to whom the checks were made payable.  We are

18   surmising that if it's payable to a private school, it was

19   likely for the tuition for one of his kids.  In one case, there

20   was a check to what appears to be, again based on the memo

21   line, an apartment complex and some suggestion that it's for

22   one of his kids to live there and credit it to them.

23            So, of the 1.371 million and change, just over 64,000

24   went to his children; and by contract, 783,150 went to him;

25   434,525 went to his wife; and let's not forget the $4,900 that

1  went to Kenwood Country Club.

2          We talked about --

3          THE COURT:  Let me ask you this.  Do, is in here, has

4  there ever been a, produced or presented a copy of Serv Trust's

5  trust agreement?

6          MR. VERSTANDIG:  Your Honor, we have it.  It is

7  notably not in our, it is not in evidence.

8          THE COURT:  Is there, I'm trying to figure out who,

9  who are the, I mean who are the beneficiaries of the trust?

10         MR. VERSTANDIG:  My understanding is that it's for

11  the benefit of his children.

12         THE COURT:  His children?  Okay.

13         MR. VERSTANDIG:  I want to be careful with my

14  words --

15         THE COURT:  Okay.

16         MR. VERSTANDIG:  -- about having it in front of me.

17  Yeah, it was always represented it was, you know, for the

18  benefit of his children.  That's why I took some care to note

19  that there are some tuition dollars and I cannot say --

20         THE COURT:  Uh-huh.

21         MR. VERSTANDIG:  -- that it's never benefited his

22  children, but we point out that there is an --

23         THE COURT:  That it -- it seems that it was not an

24  irrevocable trust I take it?

25         MR. VERSTANDIG:  Not to the best of my knowledge.

1          THE COURT:  If it was, there would be a lot of

2    problems with payments back to him and his wife, but okay.  And

3    then when you think of it, just a thought came up, you're

4    saying it's all alter ego of Mr. Myers, but you also may want

5    to address why wouldn't it potentially be an alter ego of Ms.

6    Kelly?

7          MR. VERSTANDIG:  Your Honor, I think actually the law

8    on alter ego is instructive on our, when we give

9    (unintelligible).  The law on alter ego in Maryland is the

10   Hildreth case, which you saw in our papers, but for the record,

11   838 A.2d 120, honest to God, I don't know if it's 4709, or

12   something, from the then Court of Appeals in 2003.  It sets

13   forth three elements for the establishment of an alter ego

14   which I'll paraphrase.

15         First, is that the individual must have exercised

16   dominion and must have done so singularly.  So, here we would

17   say that the evidence shows that Mr. Myers exercised singular

18   dominion over the affairs of Serv Pro.  I think the record

19   evidence is that in a variety of ways one almost every single

20   check, albeit not literally every single check, there's Mr.

21   Myers' signature.  All of these dealings of an informal

22   natural, the emails, et cetera, are by Mr. Myers and to Mr.

23   Myers.  We would actually see anecdotally in this case that

24   when Mr. Myers showed up and tried to file a motion to dismiss

25   in proper person on behalf of the trust, he did so

1    individually.  Periodically, you do see references to another

2    trustee named Daniel Ring, whose name does appear on some

3    signature blocks.  I think we want to be candid, we believe his

4    signature may be on a few of those checks, or some signatures

5    that don't look like the others; but by and large, this was

6    clearly dominated by Mr. Myers up to and including the effort

7    to remove this matter to federal court late last Friday and

8    some of these shenanigans, or whatever term, this morning.

9            Second prong under Hildreth is the use of the

10   dominance for some equitable wrong or the advancement of a

11   wrong.  And your question was about his wife and I would point

12   to the fact that the record just doesn't show her controlling

13   the trust.  We don't seem to know what's discussed in their

14   bedroom, nor is it really our problem.  It's under Maryland law

15   to inquire.  There's privilege there.  But we don't actually

16   see her in any of the emails.  We don't see her signature on

17   any checks.  We don't see her name on any agreements.

18           What we do see, and I would argue this is not

19   coincidental, is that the lion's share of distributions were

20   made to Mr. Myers.  And then if you look at his petition for

21   bankruptcy relief which is Exhibit 2, and that's dated November

22   18, 2015, the record establishes that on November 18, 2015, Mr.

23   Myers became a debtor in bankruptcy.  And I have to tell you,

24   it's the darndest thing, not a single distribution to him

25   thereafter.  Suddenly, it all goes, well, almost all goes to

1 his wife.

2        I would point out that the one, two, three, four,

3 five, six, seven, eight, nine, 10, the 11 distributions

4 immediately preceding the date when he sought bankruptcy relief

5 went to Mr. Myers, 15,000, 15,000, 30,000, 14,900, 15, 30, 30,

6 15, 15, 15, 14,800; and then once he seeks bankruptcy relief,

7 it all starts going to Barbara Ann Kelly; but the emails,

8 coupled with Mr. King's testimony, even though it was going to

9 Ms. Kelly, it was from Mr. Myers' expenditures, desires and

10 lifestyle.  He's the one who said he's getting F'd, and F'd is

11 the actual word.  He didn't spell out the word, fortunately.

12 He's the one with the country club dues.  He's the one who then

13 in his bankruptcy has scheduled an asset as being the deposits

14 in the Circuit Court for Walton County, Florida, even though we

15 know from the checks those were really paid over by Serv Trust.

16 It's Mr. Myers who says he needs money to pay his lawyers.  And

17 when Mr. Myers makes the threats at the end when the loans

18 stop, he makes clear that he needs money for his purposes or

19 bad things are going to happen.

20        So, I respect the question that it may well be that

21 if Maryland didn't have a marital privilege and we lift the

22 veil on what happened between Mr. Myers and Ms. Kelly, we could

23 determine whether or not there is a hand behind the scenes; but

24 there's simply no evidence that we were able to discern here in

25 discovery and, respectfully, I said there's no evidence in the

1   record from today that shows her exercising any dominance.   To

2   the contrary, the evidence seems to show that  many of the

3   distributions to her, again, many, not all, I want to be

4   careful with those words, seem to follow Mr. Myers' bankruptcy

5   occurred at a time when he had money passing through this

6   accounts that would be subject to outside scrutiny and seemed

7   to be pretextual in nature with her acting as, you know, a

8   shell in its furtherance.

9           Second Hildreth factor is use of that dominance to

10  perpetrate an equitable wrong or a fraud.   This is where the

11  bankruptcy comes in.   The testimony today is that Mr. Myers was

12  deeply indebted at the time this project began and that the

13  express reason for wanting to put the project in the name of

14  Serv Trust as opposed to himself was so that it wouldn't be

15  there and it would be accessible to his myriad of creditors.

16  The ultimate creditor is represented in court.   The ultimate

17  creditor at the end of the day is Mr. Myers' trustee.   He is

18  the individual statutorily charged with marshalling Mr. Myers'

19  assets pursuant to his 2015 bankruptcy in Maryland and as a

20  matter of law, marshalling them and liquidating them, and

21  dispersing the money to all the creditors in kind net of

22  serving administrative expenses.

23          And we see that when Mr. Myers filed his schedules,

24  the lists of all his assets, he claims the money in the court

25  registry was his because he claims that property is his and

1   exempt as the tenants of the entirety; but he didn't claim Serv

2   Trust was his.  He didn't claim the trust in Goldsboro was his.

3   In fact, if you look at the exhibit that is the bankruptcy

4   court's revocation of Mr. Myers' discharge, which is number

5   three, you'll see that one of the things Mr. Myers did was

6   where he thought he had equity in properties and/or his wife

7   owned, he would have Serv Trust put a lien on those properties

8   so that it had an interest before any persons would be

9   available for Mr. Myers' creditors.  He has time and again used

10  Serv Trust to hide and obstruct assets from the reach and view

11  of his creditors.  Mr. Schlossberg gave the ultimate

12  exemplification incarnation of his creditors with Mr.

13  Schlossberg being the person to divide the money and give it to

14  those creditors.  So, we have the second Hildreth factor and we

15  also have the third which is the propagation of actual harm.

16  And that's where the timeline in this case becomes interesting.

17  When Mr. Myers sought bankruptcy relief in 2015, it was

18  November 18th, he had not yet tried to defraud the Class A

19  members of Goldsboro.  The three years had not yet passed under

20  the Goldsboro operating agreement.  There had been no adverse

21  rulings or intimations of rulings from any zoning bodies.

22          Now I don't mean to suggest the rulings would be

23  different if he didn't go into bankruptcy.  We have the benefit

24  of hindsight and it turns out this may have been an ill-fated

25  project; but at that moment in time, Mr. Schlossberg should

1  have been able to step in as the Class B member of Serv Trust,
2  I'm sorry, of Goldsboro.  And whether it be liquidated pursuant
3  to the operating agreement, reach some sort of deal with the
4  parties to sell the interest to them, actively participate,
5  whatever he would deem appropriate as trustee, that was his
6  asset, but he was denied it because Mr. Myers fraudulently
7  concealed it.

8        Mr. Myers used it as his alter ego.  Serv Trust was
9  there to keep things away from his creditors, not to help him
10  be earnest and candid under Title 11 of the United States Code
11  in furtherance of his bankruptcy; and it looks like those were
12  his designs from the beginning.  I'm not sure Mr. King
13  understood this was all going on.  I'm not sure anyone would
14  have understood it when someone, you know, has to put something
15  in the name of something else, you just sort of shrug and say
16  let's go forward.  Those were the designs and we have evidence
17  not only of paramount equitable wrongs because Mr. Myers'
18  creditor case is defrauded, but before it.  So, incident, we
19  meet the alternate criteria.

20        And I know Mr. Mastro will want to eloquently speak
21  to this, but we would also submit that the bankruptcy court's
22  request to you to make a determination as to the applicability
23  of the automatic stay ought to be understood as being
24  coterminous with a determination of the alter ego question if
25  the alter ego exists and if we prevail on that cause of action.

1          And I believe everyone in here is in accord that the

2   automatic stay precludes you, no offense and I don't mean to --

3          THE COURT:   Well, I understand the thought would be

4   then Serv Trust is Myers' for the purpose of the bankruptcy;

5   and so, any judgment against Serv Pro is de facto judgment

6   against --

7          MR. VERSTANDIG:   Right.

8          THE COURT:   -- Myers?

9          MR. VERSTANDIG:   It comes, Goldsboro's obligation to

10  file a proof of claim in the bankruptcy and then either Mr.

11  Mastro and I need to find a way to try to negotiate a deal; or

12  I need to bring my redemption claim against Mr. Schlossberg in

13  the bankruptcy court under Section 157, Title 28 in the United

14  States Code, or what's known as a core proceeding because it's

15  an action against the trustee at that point in time.  But let

16  me touch on the redemption side of it because we put on our

17  evidence.

18         THE COURT:   Right, but let me ask a question.

19  Talking about what the Florida court did in terms of their

20  order because I thought it was a very interesting order about

21  Mr., because it said, it seemed to, I mean I, you can read the

22  order two ways.  You can read the order as saying that we're

23  not to decide anything against, that would affect Myers

24  individual; but that was if he, but it's in the sentence where

25  it talks about if he is a trustee of Serv Pro.  So, I guess

1  trying to, if you look at the sentence structure, it seems to
2  be related only to that.  I'm not giving it that reading, but I
3  just didn't know if anybody thought about it that way because
4  it seemed to be, you know, it says it's, you know, the stay is
5  lifted.  He says he's not a trustee and then it says, but if he
6  is a trustee, then the case can pursue against him as trustee,
7  but can't affect any individual liability.  So, it seems to me
8  that that relates to him being a trustee, not overall, but --

9        MR. VERSTANDIG:  Well, I think that's accurate.  I
10 think that's accurate for three reasons.  One, everyone is in
11 accord the guaranteed claim against him did not proceed today.
12 No one is trying to advance that claim.  The stay is in place.
13 We can't seek monetary relief (unintelligible).

14       Two is what you just said.  A reasonable reading of
15 that order clearly contemplates that relief against him as
16 trustee, even if he were to become trustee again, is within the
17 scope of what is being lifted.  Three, I know I said I had
18 three points, it's actually four.  Three, the Maryland
19 bankruptcy estate was created first.  If Serv Trust is Mr.
20 Myers' alter ego, that only impacts Mr. Myers and his creditor
21 base as it existed on, I forget what date it was, November 18,
22 2015, or something proximate thereto.  As a matter of fact and
23 law alike, but does not impact Mr. Myers or his creditor base
24 because they existed when the Florida bankruptcy was filed
25 which means the automatic stay arising under the Florida

1    bankruptcy wouldn't touch upon it.  It was never part of the

2    estate.  It was never an action against him as he was there at

3    that time.  It's an action against him as a faux fiduciary as

4    the law existed in November of 2015.

5          And I'll do one better.  If I had put on a case today

6    that showed Serv Trust was loyally and faithfully administered

7    for the benefit of his children up until November of 2015, but

8    then after Mr. Schlossberg was appointed as trustee, Myers got

9    frustrated and started using it as his alter ego, then it

10   wouldn't be Mr. Mastro's (unintelligible), it would have to be

11   someone on behalf of the Florida bankruptcy trustee and it

12   would be an issue related to the Florida bankruptcy which is

13   the later filing.

14         Finally, as to the fourth point there, I would look

15   at the order of remand which the Judge did us the benefit of

16   saying it was for the reasons set forth in our emergency motion

17   seeking a remand.

18         THE COURT:  Yeah, but I don't have your emergency

19   motion.

20         MR. VERSTANDIG:  Then I could -- I think you do.  It

21   was sent to chambers.

22         THE COURT:  Oh, was it?  Okay.

23         MR. VERSTANDIG:  Yeah, it was.

24         THE COURT:  Okay.

25         MR. VERSTANDIG:  If you need me to officially docket

 1   it, I'm, I can ask you to take judicial notice of it.  I think

 2   it's --

 3              THE COURT:  Is it, it was filed in the Florida

 4   bankruptcy?

 5              MR. VERSTANDIG:  It was filed in the Florida

 6   bankruptcy.

 7              THE COURT:  So, it's on ECF?

 8              MR. VERSTANDIG:  It's on ECF.

 9              THE COURT:  All right.

10              MR. VERSTANDIG:  And --

11              THE COURT:  Then I can take judicial notice --

12              MR. VERSTANDIG:  -- a copy was sent to chambers.

13              THE COURT:  -- and then I can take judicial notice --

14              MR. VERSTANDIG:  Yeah.

15              THE COURT:  -- of what was filed in ECF as it's a

16   material that is commonly used by courts and lawyers to look at

17   dockets and filings.

18              MR. VERSTANDIG:  Your Honor, there's a multitude of

19   arguments, and I'll be very candid, this all happened Friday

20   and --

21              THE COURT:  I understand.

22              MR. VERSTANDIG:  -- my Friday night and Saturday

23   morning were spent researching and drafting; but, one, the

24   factual background set forth in the remand motion makes

25   absolutely clear that we want to go forward this week and we're

1   asking for an emergency relief so we can to deal with the alter
2   ego issues; and, two, one of the legal arguments we make is in
3   favor of equitable extension.  Now we do argue that they moved
4   it to the wrong court, they removed it outside of the
5   limitations period set forth in the applicable rules, that
6   there's a jurisdictional defect, among other things, but we
7   also think it's a bad faith renewal.  And that goes to general
8   comity.

9            And I think knowing the Florida court was cognizant
10  that we wanted to move forward on these issues this week and
11  that somehow, even though I didn't get my motion filed until
12  the early hours of Saturday, we got a ruling out of the Florida
13  Bankruptcy Court before the open of business today, with
14  yesterday being a federal holiday.  It evinces the Florida
15  court knows what we plan on doing here and they're in favor of.
16  So, I think you do have the jurisdiction requisite to rule on
17  the alternative issues.

18           The redemption issues are much simpler.  In Section
19  7.5 and 7.7 of the operating agreement, which is Exhibit 1,
20  based on your questions earlier, it sounds to me as though
21  you've reviewed the pertinent language not going to sort of
22  dryly read it back into the record; but at court, what Mr. King
23  testified to, albeit it in legalese, at the end of three years
24  there is an option to try to redeem the Class B interest.  If
25  the Class A members want to pursue that options, they exercise

1  their right to have the property appointed.  The way they do
2  that is by giving notice to the Class B member and designating
3  an appraiser.  The Class B member then has the right to pick
4  its own appraiser.  If the two appraisers come out with
5  differing numbers that are materially different vis-à-vis the
6  cumulative papal contributions that the Class A members to
7  date, there's a mechanism to resolve that issue.  If not, if
8  the Class A contributions as of that date exceed the value of
9  the property, the Class B and trustee is redeemed for
10  consideration already rendered.  And if it doesn't exceed the
11  value of the property, the Class B and trustee moves on.
12  There's actually, there's language in there that suggests the
13  Class A members may not be allowed to do this again and again.
14  It may be they only get one shot.  We don't have to reach that
15  question because we're here on the first shot; but it's pretty
16  clear that the Class B interests have pretty good vested rights
17  in the property if it appraises for more than what the Class A
18  members have contributed.  The problem is the Class A members
19  contributed way more than what it appraised for.  And because
20  of Mr. Myers and Serv Trust intransigents, we don't have a
21  countervailing appraisal.  We have one appraisal that's in the
22  record from between a million and a million 350.  We have
23  extensive evidence in the record that puts the Class A members'
24  contributions, even withstanding the monies contributed, solely
25  to be loaned to Serv Trust in excess of that number.  And if

1  you consider the monies that were contributed to the company to

2  be loaned to Serv Trust, it's actually more than

3  (unintelligible).

4          So, we would respectfully submit that if Serv Trust

5  is not Mr. Myers' alter ego, or if you choose not to reach the

6  alter ego question, and no disrespect, I believe the record

7  shows we have exercised the redemption mechanism in accord with

8  the operating agreement and that Serv Trust has effectively

9  waived any opportunity to argue the contract.  They had 15 days

10 to appoint a contrary appraiser.  That was more than five years

11 ago.  No one was ever appointed.  So, if you reach that issue,

12 we would ask for a declaration that the Class B and trust has

13 been redeemed.  I will let Mr. Pelletier figure out what

14 happens to $300,000.  That is neither my problem, nor my horse;

15 but we believe it has been redeemed if we get there and that

16 the Class A members, Mr. King, Mr. King's wife and the trust

17 for the benefit of their children, which I'm assuming actually

18 is for the benefit of their children, are the only members of

19 6789 Goldsboro, LLC, as that entity exists today.  Thank you,

20 Your Honor.

21              THE COURT:  All right.  Thank you.  All right.

22                 CLOSING ARGUMENT BY ERIC PELLETIER, ESQ.

23                     ON BEHALF OF THE PLAINTIFFS

24          MR. PELLETIER:  Your Honor, Eric Pelletier for 6789

25 Goldsboro.  I, again, once again, will not be as eloquent as

1  Mr. VerStandig, and I will be brief.

2          I think our case has been very simple.  We have put

3  on evidence that there was a promissory note which provided for

4  attorneys' fees and interest; and monies were loaned under that

5  promissory note and have not been repaid in the sum total of

6  $1,264,737.76.  The testimony and the evidence is

7  uncontroverted.

8          The more interesting question that came up was what

9  do we do, as Mr. VerStandig just referred to, the, with the

10  $300,000 problem?  And during your questioning of Mr. King, you

11  pointed out that there are terms up to five what this equity

12  is, equity contribution, gross adjusted value or gross adjusted

13  fair market value, I think, is what you pointed out is in the

14  amended and restated operating agreement; but I think the

15  evidence is far more simple than reading through the operating

16  agreement and the various provisions of the tax code that it

17  incorporates and so on, and it is.

18          Greg Myers contributed 6,100, and I think it's $24,

19  initially to put into Goldsboro.  He also received $300,000 on

20  top of that.  So, the number comes up to the number listed in

21  the back of the amended and restated operating agreement,

22  306,000 and change.

23          But, subsequently, there was an oral agreement that

24  the money would be given to Mr. Myers, Serv Trust, Serv Trust,

25  I want to emphasize that, but it would be repaid.  And so it is

1  that, that number may not fall within the, the written

2  promissory note in terms of what was loaned because it was an

3  early-on loan, as Mr. King testified.  It was loaned at the

4  very beginning.

5       It came back out at the beginning but, nonetheless,

6  Mr. Myers got the money.  Mr. VerStandig has explained that Mr.

7  Myers has sat on his hands and stonewalled every aspect of this

8  case, including appraisal of property, so on and so forth; but

9  the bottom line is there was a subsequent oral agreement money

10  was going to be, would be given to Serv Trust and it would be

11  repaid.  That's where we are on the $300,000.  There's no

12  question that Serv Trust go that $300,000 and it hasn't been

13  repaid.

14       So, and to the extent I can amend the, conform to the

15  truth, we have a proof, rather, we have a promissory estoppel

16  detrimental reliance claim in Count 3 and ask that Serv Trust,

17  which is the party we're pursuing today, I think that applies

18  because if the money wouldn't have been loaned, I think Mr.

19  King testified if, if he knew it wasn't going to be repaid.

20  There was an agreement that it would repaid.

21       THE COURT:  But I mean that turns every contract

22  claim into a fraud claim if you, in essence, what you're saying

23  is, you know, I wouldn't have lent them money if I knew it

24  wasn't going to be repaid; but to your extent alone, it doesn't

25  get repaid, that doesn't make it, right, it only has, it only

1  becomes fraudulent if at the time that the money was received

2  that it, that the person who received it had no intention of

3  repaying it.

4         MR. PELLETIER:  Well, but here's the thing.  It's

5  not, I'm not arguing for fraud.  I mean there is an element of

6  fraud in Mr. VerStandig's case in, in paramount equity and all

7  that stuff.

8         THE COURT:  Right.

9         MR. PELLETIER:  And it's certainly here in the

10 evidence, but what I'm saying, it's promissory estoppel.  You

11 know, I changed my position giving, I being Mr. King, changing

12 position by loaning the money with the understanding that it

13 would be repaid and it hasn't been repaid and damage has

14 ensued; or if you don't want to look at it under that lense of

15 quasi-contract, we, we would ask the Court to allow us to amend

16 to conform to the proof for an unjust enrichment claim because

17 there's no question that Serv Trust got this money and there's

18 no question that it's unfair for them, they've received the

19 benefit, they know they've received the benefit and it's, it's

20 inequitable for them to retain that sum.

21        THE COURT:  Well, but okay, I mean it may or may not

22 be, it would be inequitable for nothing, but they brought this

23 opportunity.  It's 6789 Goldsboro to the King parties and so --

24        MR. PELLETIER:  Right.  And --

25        THE COURT:  -- in essence, they said, oh, this is a

113

1  great opportunity.  Mr. King testified that he thought it had
2  worth even after he's given out hundreds of thousands of
3  dollars to Mr. Myers, he still thinks it's got, that he's going
4  to, he's not loaned him that money thinking it's not coming
5  back; and he's thinking it's coming back from the sale and --

6        MR. PELLETIER:  Well, so, here's the thing, Your
7  Honor.  And, and, and, and Mr. VerStandig, and there's in
8  evidence, there is an appraisal that Mr. King, or the King
9  family, or 6789 received; and Your Honor has been practicing
10  law for a long time.  You know what happens when, when parties
11  have competing evaluations.  The other side gets a valuation
12  and says, oh, that property is worth, sorry about that, worth,
13  worth $3 million.

14        THE COURT:  Right.

15        MR. PELLETIER:  And that's where Mr. Myers would get
16  his, you know, get his benefit back on that $300,000 capital
17  investment; but he just won't do that.  He's, he has foiled the
18  process by not cooperating in any respect ever in this case.
19  He's only taken money, just the taking of all the money; and
20  you've heard, you know, now hours of testimony about where the
21  money went.  We've got documents that show how it was used.
22  There is a fog of inequity around this, notwithstanding the
23  fact that above it all, Mr. Myers is sitting on his hands so
24  that if he wanted to get that, that, that, that property, that
25  value back in his capital contribution, quote, unquote,

1  "306,000 and change," they could sell the property and see

2  where it lands; but, but that in itself has been frustrating.

3          THE COURT:  But he can't now because he wants me to

4  redeem that interest so that he will get nothing.

5          MR. PELLETIER:  Well, and, and I, then that's as far

6  as I'm going to go on that for that reason.  So, but I'm just

7  saying there is inequity that the last element of unjust

8  enrichment.  So, I, with that, I'll submit.  I think we've

9  proven our case to the tune of $1.5 million.  You, you, you

10  have the numbers in front of you and, you know, again, my

11  arguments today have by, by virtue of the lingering bankruptcy

12  issues, they are somewhat secondary because we don't know

13  what's going to happen with alter ego and so on.

14          THE COURT:  Let me ask you this.  Counsel --

15          MR. PELLETIER:  Thank you.

16          THE COURT:  -- Mr. VerStandig says he thinks

17  everybody is in agreement that if I find an alter ego that, in

18  essence, then I lose my jurisdiction here, not necessarily

19  ultimately, but I, I'm stayed at that point from finding in

20  your favor based on the evidence today.  Do you agree with that

21  or disagree with that?

22          MR. PELLETIER:  Well, I, I think, I'm going to be

23  frank with the Court and candid, we talked into, over the

24  weekend we had planned that I wouldn't put on any proof and

25  that Your, Your Honor would rule on the alter ego issues and I

1  would just sit here and, and with Ms. Wilburn and, you know,
2  try and be productive.

3            THE COURT:  Okay.

4            MR. PELLETIER:  But, but I, we understand that, Your
5  Honor.

6            THE COURT:  Okay.  So, the, all right.  I just want
7  to make sure.  All right.  I'm happy to hear from the trustee
8  because --

9            MR. MASTRO:  Thank you, Your Honor.

10           THE COURT:  -- in essence, what I'm hearing is that
11 you ultimately are the one that would be claiming that you were
12 defrauded or suffered fraud as a result of an alter ego issue?

13                   CLOSING ARGUMENT BY FRANK MASTRO, ESQ.

14                      ON BEHALF OF THE DEFENDANTS

15           MR. MASTRO:  That's, that's right, Your Honor, and I
16 think --

17           THE COURT:  Okay.

18           MR. MASTRO:  -- what I wanted to address was I think
19 there may have been some confusion stemming from the order of
20 abstention as to the applicability of the stay.  And just to
21 put things in context, I had a chance to kind of re-review this
22 this morning and Mr. VerStandig referred to the Exhibit 3,
23 which is the memorandum opinion denying the debtor a discharge.
24 That's from September 28, 2018.  A month later, and this is
25 recited in the first paragraph of the order of abstention,

1   there is the adversary proceeding, the alter ego adversary

2   proceeding is filed in the bankruptcy court.  That's --

3              THE COURT:  Okay.

4              MR. MASTRO:  -- October 29, 2018.

5              THE COURT:  All right.  So, you're clear that the

6   alter ego issue was at issue in the abstention?

7              MR. MASTRO:  Right.

8              THE COURT:  Okay.

9              MR. MASTRO:  It was filed as an adversary in the

10  bankruptcy court.  And at the same time that adversary was

11  going on, there was a proceeding here in Montgomery County that

12  involved all of the claims today, except the alter ego.

13             THE COURT:  Right.

14             MR. MASTRO:  Okay?  And then what happened was the

15  very next day and this is, I think, on page 2 of the order of

16  abstention, the plaintiff in the, in the adversary proceeding

17  files a motion asking the court, the bankruptcy court, to

18  declare whether or not the stay applies to the existing claims

19  in Montgomery County here regarding the claims of six, seven,

20  eight, nine, and the redemption claim that Mr. VerStandig is

21  also litigating.  So, and the argument being made in bankruptcy

22  court is that these matters in Montgomery County should be

23  stayed because if Serv Trust is deemed to be the alter ego of

24  Mr. Myers, then the automatic stay is going to take effect.

25             THE COURT:  Right.

117

1          MR. MASTRO:   And the way the bankruptcy court deals
2   with this is the bankruptcy court says, number one, I'm going
3   to abstain on deciding the alter ego issue.   That's really a
4   matter of state law.   The state court, Your Honor, here in
5   Montgomery County, you can decide that.

6          And as to whether the automatic stay applies to the
7   remaining claims, the claims of Goldsboro and the redemption
8   claim, that can be, that can be determined, the applicability
9   of the stay can be determined in this court.   And, ultimately,
10  when we, when Mr. VerStandig filed the amended complaint with
11  the alter ego claim, the motion to determine the automatic
12  stay, I guess, never was revived.   So, I don't know that
13  there's any motion before this Court right now to determine the
14  automatic stay; but to the extent the Court wants to get a
15  handle on that and, and understand that, we submit that, number
16  one, the automatic stay in the Maryland bankruptcy does not
17  apply, clearly does not apply to the alter ego claim --

18          THE COURT:   Right.

19          MR. MASTRO:   -- because that claim, the Maryland
20  Bankruptcy Court said, no, you got to decide it, Judge Lease,
21  here in Montgomery County.   This is an estate court matter.

22          As for the, the other claims, the claims of the
23  Goldsboro and the redemption claim, those claims, we would
24  submit, it's, it's pretty easy if you decide the alter ego
25  claim first --

1         THE COURT:  Uh-huh.

2         MR. MASTRO:  -- because then if you find that Serv

3    Trust is the alter ego of Mr. Myers, then the stay is going to

4    apply because then their, their judgments they are seeking

5    against Serv Trust become judgments they are seeking against

6    Mr. Myers.  If, on the other hand, you find that Serv Trust is

7    not the alter ego, then the stay clearly doesn't apply because

8    you're seeking judgments against Serv Trust and that Serv Trust

9    is a separate and distinct entity for Mr. Myers.  That's the

10   easy way to resolve it.

11        Whether this Court wants to get into some

12   determination, well, you know, can I decide the claims of Serv

13   Trust and the redemption claim, or the claims of Goldsboro

14   against Serv Trust and the redemption claim while the alter ego

15   is pending, that, that gets a little more harry.  We'd submit

16   that because, for the same reasons that were argued in the

17   bankruptcy court, that because ultimately there's the

18   possibility that Serv Trust could be determined to be the alter

19   ego, that those claims should be deferred pending that

20   resolution by this Court.  So, I think that's really the

21   threshold --

22        THE COURT:  Uh-huh.

23        MR. MASTRO:  -- issue that needs to be determined.

24   And the bankruptcy trustee, obviously, has, has been patient

25   through all the machinations by Mr. Myers going down to

119

1   Florida, coming back here and we, we'd simply ask the Court to

2   rule on that issue at this time.

3           THE COURT:  And do you, do you agree that if by

4   ruling on the alter ego issue that I'm, if I'm saying,

5   theoretically, ruled that, that it was an alter ego, that that

6   would then, wouldn't affect Mr. Myers in his Florida bankruptcy

7   because the asset would have been an asset of his Chapter 7

8   bankruptcy which was previous, or filed prior to the Florida

9   bankruptcy?

10          MR. MASTRO:  Correct.

11          THE COURT:  Okay.

12          MR. MASTRO:  Correct, because this goes to the, the

13  alter ego predates, pre, pre, it's pre-petition as to the --

14          THE COURT:  Right.

15          MR. MASTRO:  -- Maryland bankruptcy; so, therefore,

16  it's an asset that once he filed the Maryland bankruptcy, that

17  becomes an asset of the Maryland bankruptcy estate.

18          THE COURT:  Right.

19          MR. MASTRO:  What he does afterward has no effect on

20  the status of that particular asset.

21          THE COURT:  Okay.  All right.

22          MR. MASTRO:  Thank you, Your Honor.

23          THE COURT:  Thank you.  All right.  Anybody want to

24  be heard in response to anything that, the questions that I had

25  or anything else?

1       MR. VERSTANDIG:  Very briefly, Your Honor.  I want to

2   address one point that you raised at the beginning today which

3   went to the finality of judgments.

4       THE COURT:  Uh-huh.

5       MR. VERSTANDIG:  And I want to be very careful not to

6   waive the grounds of procedure.

7       THE COURT:  Well, here is what I would say.  With

8   respect to, I think, following what the, I think it was the

9   trustee said is if I find that there's alter ego and from what

10  the agreement is, is that I find that, and then I have to stay

11  the balance of the case --

12      MR. VERSTANDIG:  But --

13      THE COURT:  -- pending further action in the

14  bankruptcy court.

15      MR. VERSTANDIG:  I would concur with that and without

16  finding, like you don't even, beyond, if you make that finding,

17  I strongly suspect, irony being well-appreciated, that one of

18  us will then remove this case to the Maryland Bankruptcy Court

19  to take it off your plate.

20      THE COURT:  Okay.  Well, understood.  Great.  And

21  just, I don't, I don't think it's, I don't think I have a clear

22  picture of how the two bankruptcies are working together and

23  actually have a good idea of that.  All right.  I do have a lot

24  of material that I'm going to look at.  I'm going to look at

25  what was reviewed there, but I, I want to get this resolved

1  today.  I don't know how far everybody has traveled to be

2  here --

3          MR. VERSTANDIG:  Far.

4          THE COURT:  Far?  Okay.

5          MR. PELLETIER:  No far for us.  We're Main, Maryland.

6          THE COURT:  Okay.

7          MR. MASTRO:  I'm in Maryland.

8          THE COURT:  Well, you're --

9          MR. MASTRO:  So --

10          THE COURT:  -- so you're not going out of town?

11          MR. MASTRO:  No.

12          THE COURT:  You're not, wouldn't go back to Baltimore

13  or somewhere for your office or something?  You, what I want to

14  do, I want to bring you back around 3:30 --

15          MR. MASTRO:  Okay.

16          THE COURT:  -- to give the ruling.  That way I've had

17  an opportunity to review a lot of documents here and figure out

18  what I have to review to make a decision.  I will then put

19  together my thoughts so I can make a ruling today, but I don't

20  want to put this off any further and you'll get your ruling

21  today; but get you back at 3:30, or is everybody okay?  I mean

22  I, I, if somebody wants to go back to your, you know, office?

23          MR. MASTRO:  That works for me, Your Honor.

24          THE COURT:  Okay.  All right.  We'll see everybody

25  back at 3:30.

1          MR. PELLETIER:  Thank you, Your Honor.

2          MS. WILBURN:  Thank you, Your Honor.

3          MR. VERSTANDIG:  Thank you.

4          THE COURT:  Yeah.  Do you need this?

5          THE CLERK:  Yes, I do.

6          THE COURT:  I thought so.  All right.  Great.  Thank

7  you all.  Have a great lunch and we'll see you this afternoon.

8          THE BAILIFF:  All rise.

9          THE CLERK:  The Court stands in recess.

10          MS. WILBURN:  Your Honor, can we leave the, our

11  materials in here until 3:30?

12          THE COURT:  Sure, yeah.

13          (Recess.)

14          THE BAILIFF:  All rise.  The Circuit Court for

15  Montgomery County is back in session.  The Honorable David

16  Warren Lease presiding.

17          THE COURT:  All right.  Good afternoon, everyone.

18  Please be seated.

19          THE CLERK:  Calling, recalling Case No. 436977V,

20  Brian King, et al. v. Serv Trust, et al.

21          THE COURT:  Okay.  Let's go ahead and have the

22  parties just identify yourselves for the record, please.

23          MR. VERSTANDIG:  Good afternoon, Your Honor.  Maurice

24  VerStandig on behalf of Brian King, Cristina King and the

25  Cristina and Brian King Children's Trust.  I'm joined in the

1    courtroom by Brian King, who is seated to my left.

2              THE COURT:  All right.

3              MR. PELLETIER:  Eric Pelletier and Frances Wilburn

4    here for 6789 Goldsboro, LLC.

5              THE COURT:  All right.

6              MR. MASTRO:  Good afternoon, Your Honor.  Frank

7    Mastro on behalf of nominal defendant Roger Schlossberg,

8    Chapter 7 Bankruptcy Trustee.

9              THE COURT:  All right.  Good afternoon.  And my

10   understanding is that Mr. Myers has joined us by Zoom, is that

11   correct?

12             MR. MYERS:  (No affirmative response.)

13             THE CLERK:  Yes.

14             THE COURT:  Okay.

15             MR. MYERS:  I was told to be silent, Your Honor.

16   Thank you.

17             THE COURT:  Okay.  Well, I, I just, we're just here

18   for the ruling, but I just want to make sure that the record

19   reflects that you're here on the record.  I will let you know

20   that this morning in your absence I did rule on your motion

21   for, to disqualify me.  I felt that that was before the Court

22   and that before I could proceed, I did need to address that

23   motion.  I did address that motion.  I denied the motion

24   primarily for the reasons that I denied it last year, which was

25   an oral motion that you had made, but I did want to let you

124

1  know that that was done.

2         This matter is before the Court for trial today.  It
3  really sets forth sort of two different tracks as to how the
4  case would proceed and it primarily resolves from the order of
5  abstention issued by the United States Bankruptcy Court back on
6  January 30, 2019.  In that order, Judge Lipp at the time
7  specifically remanded the case or abstained from the case so
8  that this Court could determine the, the application of the
9  automatic stay based upon the relationship between the debtor
10 and Serv Trust, then, and then making that determination
11 whether or not the stay would be applied; and if so, then the
12 parties would come back to the bankruptcy court to figure out
13 how to proceed.  So, that's sort of the, the preliminary issue
14 is that the question as to whether or not Serv Trust served as
15 the argument being an alter ego or whether it should be
16 disregarded under the caselaw that was before the Court.  If
17 the Court makes the determination that Serv Trust is, indeed,
18 an alter ego or that the trust entity should be disregarded for
19 the purposes of the litigation, then the matter would be stayed
20 and the matter would be then referred to the bankruptcy court
21 in Maryland for further proceedings.

22         If, however, the Court determines that the, there is
23 not an alter ego relationship, or that the entity should be
24 disregarded, then the Court could proceed with respect to the
25 claims against that entity only for the purposes of today's

1  proceedings.  Those were the claims primarily as to whether
2  there was an appropriate redemption of Serv Trust's interest in
3  6789 Goldsboro Road, LLC, and the second would be whether the
4  amount of the promissory notes and the claim for promissory
5  estoppel by 6789 Goldsboro Road against Serv Trust should be
6  adjudicated in the amount of that judgment should be.  That
7  would be without effect on Mr. Myers; and as I pointed out this
8  morning, under the Frow Doctrine, if Mr. Myers ultimately was
9  successful in reducing or showing that that amount and
10 ultimately was not due to, was not owed by Serv Trust, Serv
11 Trust would be entitled to take advantage of that finding and
12 that you can't have incongruent judgments, the Frow case, which
13 is a United States Supreme Court case, which has been
14 recognized in Maryland, dates back into the early 1800s.

15        So, initially, the Court has to determine whether or
16 not the Serv Trust served as an alter ego -- can you go in?  I
17 just let a few of my papers in the chambers.  Pull the stuff
18 off my desk that's highlighted.  I think I've got everything.
19 All right.

20                          JUDGE'S RULING

21        THE COURT:  Well, I'll note at the outset that Serv
22 Trust, there's an issue as to whether it is a statutory trust
23 or if it is a non-statutory trust.  Ultimately, that issue did
24 not become material for me.

25        (Discussion off the record.)

126

1           THE COURT:  All right.  So, as I mentioned, the

2   Court, I didn't find that it was actually material regardless

3   of whether it was a statutory or non-statutory bill.  I do note

4   that under the Doctrine of Judicial Admission, that I do find

5   that it was statutory in the sense that Mr. Myers had filed a

6   document with the Court noting and signing it on behalf as the,

7   that it was a statutory trust and that it was set forth in his

8   motion for intervention which was Plaintiff's Exhibit 13 in the

9   matter.  At the time it says, bar, and it says, well, the

10  documents that are associated with it note that and the

11  signature page itself.  That's, that's on page 7 of the motion.

12  It says, "Serv Trust, a Maryland statutory trust signed by Mr.

13  Myers, trustee," and that, it's set forth as a judicial

14  admission for the purposes of this proceeding.

15          So, the parties have argued that the Court should

16  view Serv Trust as an alter ego of Mr. Myers and that arguing

17  that under the case of, that Hildreth v. Tidewater Equipment

18  Company, Inc. case, that noted that the Court will apply the

19  doctrine where the plaintiff establishes that there's complete

20  domination of not only the finances, but of the policy and

21  business practices in respect to transactions so that the

22  corporate entity as to this transaction had at the time no

23  separate mind, will or existence of its own; two, that such

24  control was used by the defendant to commit fraud or wrong, or

25  perpetrate a violation of a statutory or other positive legal

1  duty or dishonest and unjust act in contravention of the
2  plaintiff's legal rights; and, three, that such control and
3  breach of the duty proximately caused injury or undue loss.

4         Now the court also in that case notes that the
5  corporate shield will be disregarded where a corporation is
6  used as a mere shield for the preparation of a fraud, the court
7  shall disregard the fiction of this separate corporate entity.
8  It's set forth in the bench memorandum that was provided by
9  plaintiff that the issue of whether or not this doctrine would
10  apply to other entities such as a trust has been decided in the
11  affirmative in the Deckelbaum v. Cooter, Mangold case at 275
12  B.R. 737 (D. Md. 2001) case.  I note that that case also had
13  been on appeal before in In re Boyer, a matter in which was 145
14  F.3d 1323, which I believe was an unreported opinion.  The
15  underlying opinion was set forth was reported.  I did review
16  all three of those opinions and do conclude that the issues
17  that can disregard an entity is not exclusive to corporations,
18  although that's where the doctrine originated from.

19         So, what do we have here?  You know, the question is
20  that we had a situation where Serv Pro was, not Serv Pro, Serv,
21  Serv Trust was operating at this time, a relevant time, and
22  what the evidence presented to the Court shows is that it was
23  operating merely as a conduit to distribute funds to Mr. Myers
24  and his wife, Ms. Kelly, in an effort, the Court believes, to
25  frustrate his creditors in this matter.  That Mr. Myers

1  controlled this entity which purpose was to provide for the

2  education, schooling and housing of the Myers' children.

3  However, during the relevant period in this case, some $1.37

4  million was funneled through that entity to Mr. Myers and/or

5  his wife, or other entities.

6        Now I note that the majority of it, some 738,000, was

7  directly paid to Mr. Myers; 434,525 went to his wife, Ms.

8  Kelly.  Some 16,825 went to various courts.  Those courts were

9  for funds that were being paid into escrow which were then

10  subsequently listed on Mr. Myers' bankruptcy filings as

11  belonging to him.  There were payments to attorneys of $16,713,

12  country club membership.  There were payments of $64,527 which

13  were distributed to Mr. Myers' children's schools and housing;

14  however, the Court finds that this amount of payment was of

15  such a de minimis amount given the, in relationship to the

16  $1.37 million which was funneled through Serv Trust as to show

17  that the main goal and purpose of the, of Serv Trust was to

18  shelter funds from Mr. Myers' creditors.

19        Now what I did go back and I read in great detail was

20  the opinion in the United States Bankruptcy Court of the, which

21  was Plaintiff's Exhibit 3, which was the trustee's decision, or

22  strike that, granting the trustee's complaint denying discharge

23  to Mr. Myers in Chapter 7 bankruptcy that had been converted

24  from a Chapter 11.  I don't need to go through all of what's in

25  there, but what struck me is that the Court agreed with the

129

1  United States trustee that Myers knowingly and fraudulently
2  made false oaths in his bankruptcy case sufficient to denying
3  of a discharge, citing to Mr. Myers that Mr. Myers explained
4  that the other 50 percent owner of Goldsboro, who we, was
5  undisclosed at the time of his one, or of his 341 meeting, made
6  capital contributions to Goldsboro that could then be loaned to
7  the Serv Trust and that money went to the benefit of the
8  beneficiaries of the trust, is what he testified to.

9          The timing of the loans from Goldsboro to the
10 execution of the Goldsboro guaranty, combined with Myers
11 oscitation of his liability to Goldsboro at the 1341 meeting
12 were sufficient to require a finding of fraudulent intent for
13 the purposes of Section 727(a)(4). The Court there found it
14 was not believable that he simply forgot to include the
15 largest, unsecured creditor in the first of several versions of
16 his schedules when he had executed a personal guarantee in
17 favor of that creditor six months prior to the filing of the
18 bankruptcy and was requesting advances from the creditor up to
19 and after the filing of his petition.

20         The advances to Serv Trust, which funds were then
21 made available, and the Court, that court then found that the
22 funds were then made available to Myers and/or Kelly,
23 purportedly to pay for the child's education or household
24 expenses. That opinion also notes that Mr. Myers was adamant
25 at trial that every payment that he and/or Kelly ever received

130

1  from Serv Trust was for the benefit of his children.  He then
2  argued that he was always considered the Serv Trust payments to
3  be loans regardless of how they were classified in the
4  schedules or what was said at the 341 meeting because neither
5  he nor Kelly is the beneficiary of Serv Trust.

6         Myers' classification of the payments he and/or Kelly
7  received from Serv Trust as loans is suspect if, as irrefutably
8  testified to by Myers, every payment from Serv Trust to Myers
9  and/or Kelly was for the benefit of their children, it then
10 appears Serv Trust was serving its intended purpose, i.e.,
11 providing for the Myers children.  Such payments would not be
12 loans to Myers and/or Kelly.  They would have been
13 distributions to the trust beneficiaries.

14        The Court further goes on to note that Myers
15 testified at the 341 meeting that Serv Trust can distribute
16 money for anything to his children's benefit, including food,
17 clothing and tuition.  Myers was adamant that his children's
18 expenses exceeded any amounts ever distributed on their behalf
19 by Serv Trust.  He admitted that he did not keep a log of the
20 expenses he paid on behalf of the children and that he
21 deposited the funds into his own checking account, but
22 maintained that the tuition expenses alone exceeded any amounts
23 received from the trust.

24        The Court further noted that Mr. Myers testified that
25 there were ongoing litigation between Serv Trust and Goldsboro,

131

1  so he did not what to characterize the advances made from Serv

2  Trust to Goldsboro as reflected in the Goldsboro's promissory

3  note as loans.  On the other hand, when he testified during his

4  own cross-examination, he testified that his second-amended

5  schedule reflected no income because by then there were no more

6  loans from Serv Trust, there were no more loans from Goldsboro,

7  and so there was no more income and then I lost my disability

8  in March of 2016; and I believe Goldsboro made its last loan in

9  August of 2016.  This testimony makes clear that the advances

10 from Goldsboro to Serv Trust were going to Myers and Kelly.

11            The Court further noted that, in other words, when

12 Goldsboro was not included in the debtor's bankruptcy case,

13 Serv Trust was asserting a greater lien on lot six of the sale

14 proceeds because that would enable Myers to access those funds

15 through Serv Trust.  And so, what I found from the testimony

16 here is that I, I find it inconceivable that $1.37 million was

17 used for the children's education.  There's no evidence of that

18 whatsoever.  It is, it is beyond the pale.  I find that at his

19 bankruptcy proceeding, Mr. Myers' explanation of what the funds

20 were, how they were obtained and what they were for were

21 contradicted by himself, which notes that during this time that

22 these funds were being provided to as a way to avoid his

23 creditors and to avoid payment to those creditors.  They were

24 basically shielding these, these amounts of money from his

25 creditors.

1          So, I do find, one, that he did have --

2          MR. MYERS:  I'm sorry, Your Honor, I thought I wasn't

3    a party to this proceeding?

4          THE COURT:  Sir --

5          MR. MYERS:  You're saying it's about me.

6          THE COURT:  What I'm saying is I'm deciding whether

7    or not you were, whether or not Serv Trust is an alter ego.

8    This is what the abstention from the bankruptcy court is about.

9    And so, I'm finding that based upon these proceedings --

10          MR. MYERS:  You understand, Your Honor, you do

11    understand the abstention order is irrelevant because I filed

12    subsequent Chapter 13.

13          THE COURT:  I understand that.  Sir, I understand

14    that is your belief, all right?  And you can certainly

15    appeal --

16          MR. MYERS:  (Unintelligible).

17          THE COURT:  -- that based on that.  I will make my

18    findings here today and you may, and you will do with them with

19    what you want; but I believe that the subsequent Chapter 13 is

20    not relevant to the abstention order and I will make that clear

21    in my holding as I get further along.

22          So, what I do find is that the --

23          MR. MYERS:  From the, from Judge Lipp, the order

24    you're reading from where he makes a finding of fact that Serv

25    Trust was established by my mother in 2010 for the benefit of

133

1  my five children, the finding of fact --

2           THE COURT:  I see that finding, sir.  What I'm

3  finding is that based on the evidence here and the amounts of

4  money that was transferred through that organization to you and

5  your wife personally, that the, whether it was established for

6  that purpose, it was not utilized for that purpose.  It was

7  rather utilized to defraud your creditors and to defraud the

8  bankruptcy court and to defraud the trustee.

9           MR. MYERS:  I --

10          THE COURT:  Sir --

11          MR. MYERS:  How could I defraud my creditors when

12 I've never owned any property that was put into Serv Trust?

13 How could it defraud my creditors when they and Offit Kurman

14 represented me and Serv Trust before the, it got there.

15          THE COURT:  All right, sir.

16          MR. MYERS:  How could it defraud my creditors if it's

17 a Maryland common law centric trust and the law in Maryland is

18 clear that nothing I do as a trustee could ever affect the

19 corpus of that trust?

20          THE COURT:  All right.  Well, I disagree.  One, is I

21 found that it is a statutory trust based on your filings in

22 this court; and so, based on that --

23          MR. MYERS:  That, that's --

24          THE COURT:  -- that's where we are.

25          MR. MYERS:  -- to intervene.  Nothing I do, Your

134

1    Honor, and you know this, nothing I do as a trustee can change

2    that trust document.

3              THE COURT:  Well, I --

4              MR. MYERS:  And I must say --

5              THE COURT:  -- it does when you, it does when you

6    perpetrate fraud and that's what I'm getting to here.  So, I

7    would ask if you just please --

8              MR. MYERS:  You're just finding --

9              THE COURT:  -- I'm making my findings --

10             MR. MYERS:  -- you're making findings of fraud?

11             THE COURT:  I'm making findings that you perpetrated

12   and used this, you used the, that the Serv Trust was used to

13   perpetrate a fraud, yes, that's what I'm finding.

14             MR. MYERS:  On who?

15             THE COURT:  On the bankruptcy trustee in this case.

16             MR. MYERS:  He never brought that claim.

17             THE COURT:  He is here.  He made that claim in court

18   today.  So --

19             MR. MYERS:  Well, it's too late.  He's already past

20   his time to make that claim; and, by the way, if you read in

21   that order, you will find that Judge Lipp said that I did not

22   transfer any property to anybody fraudulent.

23             THE COURT:  All right.

24             MR. MYERS:  She denied the trustee's claim on that

25   count.

```
 1              THE COURT:  All right.  Well, what I'm finding here
 2    is that based on the evidence that was presented to me today,
 3    that I've seen that it's rather clear that the monies that were
 4    sent through the trust to you and your wife personally, which
 5    were --
 6              MR. MYERS:  Yeah.
 7              THE COURT:  -- greater than a million dollars, was --
 8              MR. MYERS:  Yeah?
 9              THE COURT:  -- used in order to shield those funds
10    from your creditors.
11              MR. MYERS:  What creditors?
12              THE COURT:  And, and, therefore --
13              MR. MYERS:  What creditors?
14              THE COURT:  -- and, therefore, I am going to find
15    that --
16              MR. MYERS:  Well, you haven't identified a creditor.
17              THE COURT:  Sir, I'm not here to argue with you.  I'm
18    giving my opinion.  So, I ask that you --
19              MR. MYERS:  It has to be paid from, in fact, in the
20    King party admittedly have no claim against me; and the
21    bankruptcy court has found that.  And Goldsboro has nothing but
22    a guarantee from me.  I owe Goldsboro nothing.  So, how did I
23    defraud anybody?
24              THE COURT:  All right.
25              MR. MYERS:  You, sir, are, this is disgraceful.  This
```

1  is a common law centric trust that the bankruptcy court found
2  was established by my mother in 2008.

3         THE COURT:  Well, what I'm going to do here is, what
4  I'm going to do here is when you get back, you're going to go
5  right back to that same bankruptcy court and then you can
6  make --

7         MR. MYERS:  I'm going to the bankruptcy court.

8         THE COURT:  Well, going back --

9         MR. MYERS:  I'm going to Florida where this case
10 currently is which you ignored --

11        THE COURT:  Well, this --

12        MR. MYERS:  -- that order.

13        THE COURT:  This case is currently in Maryland also,
14 sir; and so, you can make your arguments in Maryland or you can
15 make your arguments -- I'm going to leave it up to the
16 bankruptcy courts as to how to deal with this case; and so, as
17 I go through my findings here, I find that it would be under an
18 alter ego --

19        MR. MYERS:  It sounds like --

20        THE COURT:  -- situation.

21        MR. MYERS:  This case sounds like a lot of findings
22 about me when the case went, when the claims against me are
23 stayed.  You just said you made a finding of fraud against me.

24        THE COURT:  Well, that, that, money went through
25 that, that entity, Serv Trust, were used to defraud.  So, the

1  entity Serv Trust was used as a fraudulent vehicle and,

2  therefore, it's going to be, its, its trust will be disregarded

3  and I will find that it is an alter ego or that --

4         MR. MYERS:  There is --

5         THE COURT:  -- it was used to, was used to perpetrate

6  a fraud.

7         MR. MYERS:  There is no law in Maryland that allows

8  alter ego for a common law centric trust.

9         THE COURT:  Well, sir, first, I found that, one, I

10 disagree with you; and, secondly, I find as a matter of

11 judicial admission in this case that it is a statutory trust

12 that you set forth and signed a document submitted to this

13 Court identifying as such.  So, if you want to argue that it's

14 different, that ship has sailed.  I'm, you're bound by the

15 representations of the Court.  So --

16        MR. MYERS:  Okay.  I did not change that trust

17 document.  No trustee can come into court, sign a paper and

18 make that trust document something it isn't.

19        THE COURT:  Okay.

20        MR. MYERS:  And by the way, where are the

21 beneficiaries in this case?  You have none of them before you.

22 They weren't served.  It's a common law trust.

23        THE COURT:  Well, if, sir --

24        MR. MYERS:  So, you don't have the parties before you

25 to do this.

138

1          THE COURT:  Well, sir --

2          MR. MYERS:  This entire exercise, with all due

3  respect, Judge, is a hack job by the trustee because Judge

4  Albright made a ruling at a motion to dismiss that the contract

5  that Mr. King signed is enforceable and that, yes, he did

6  commit fraud if what we alleged was true.  And Mr. VerStandig

7  decided one month later for the first time after six years of

8  doing business with Mr. King that, oh, now all of a sudden

9  there's an alter ego claim.  Never before did that come up.

10  Why don't you do your job, sir, and look at the facts and look

11  at what's going on here.  There's a crime being committed here.

12  Did you look at the facts of what was attached to my motion to

13  remove where they altered tax returns?  Did you look at that

14  email, sir?

15          THE COURT:  Well, sir, I, all I note is that the

16  motion to remove was denied, or was remanded back, so --

17          MR. MYERS:  I'm not asking that.  I'm asking did you

18  look at the email attached where the King party --

19          THE COURT:  Sir, I'm not --

20          MR. MYERS:  -- fraudulently submitted a tax return in

21  this case in your court?

22          THE COURT:  All right.  Well, like I said, I'm, all I

23  know is that the matters before me, I'm making my ruling based

24  on the evidence that was before me today.

25          MR. MYERS:  Right.  You don't have the evidence.  You

1    have a pack of lies is what you have.

2              THE COURT:  Okay.

3              MR. MYERS:  And by the way, Judge, I didn't hear

4    where you said you ruled on my motion to dismiss for lack of

5    subject matter jurisdiction because you have no order from the

6    bankruptcy court allowing Mr. King to sue the Chapter 7

7    trustee.

8              THE COURT:  All right.  Well, I, I had previously

9    denied that.  If I hadn't, I'll deny it now.  There is, I find

10   that I have subject matter jurisdiction; and if I'm wrong about

11   these things, Mr. Myers, then it's great, the subject matter,

12   it was subject matter jurisdiction --

13             MR. MYERS:  Okay.  Well, I --

14             THE COURT:  -- cannot be waived, period; and so, if

15   bankruptcy court, or another court base your determination --

16             MR. MYERS:  That is one --

17             THE COURT:  -- that I don't have jurisdiction, then

18   all of this is a nullity.  Similarly --

19             MR. MYERS:  One question.  Is there anywhere in the

20   record of this case an order, written order entered by the

21   bankruptcy court, not an order of abstention, a written order

22   that permits Mr. King to sue the Chapter 7 trustee?

23             THE COURT:  Well, if I'm, I have an order of

24   abstention that says I'm to make this determination as to alter

25   ego.

140

1        MR. MYERS:  No.

2        THE COURT:  And that's what I'm making.

3        MR. MYERS:  Is not going to make any determine -- it

4   doesn't say that Mr. King can sue the Chapter 7 trustee.

5   Without that order, in your opinion --

6        THE COURT:  Well, I think, I think that --

7        MR. MYERS:  -- you have --

8        THE COURT:  -- I think that's for the Chapter 7

9   trustee to raise and is their issue, and you don't have

10  standing to raise that issue.  If you think it's a

11  jurisdictional issue, then, again, Mr. Myers, you're going to

12  have an opportunity to probably litigate this all back into

13  bankruptcy court here --

14       MR. MYERS:  Well, it's --

15       THE COURT:  -- because what I will find and, and,

16  sir, I'm going to ask you to just let me finish my ruling here

17  so that I can make sure I get the facts that I wish to on the

18  record.

19       MR. MYERS:  Well, they're not, all deal with me and

20  (unintelligible).

21       THE COURT:  Okay.  So, I do find that the second

22  factor of alter ego was applicable, that it did, defendant did

23  commit a fraud or wrong.  And like I said, I also find that the

24  use of the trust here was a mere shield for the preparation of

25  fraud.

141

1    Lastly, I do note that such control did cause injury

2  in the sense that the creditors of Mr. Myers were and, quote,

3  strike that.  That the bankruptcy trustee was deprived of

4  potential assets in the bankruptcy estate.  So, based on those

5  findings, I do find that Serv Trust is either an alter ego or

6  its forms should be disregarded as a perpetrator, as, as it was

7  used to perpetrate fraud.

8    Based upon that finding, I do find under the order of

9  abstention that the claims against Serv Trust here, as well as

10  those against Mr. Myers, are stayed pursuant to the bankruptcy

11  that's pending in Maryland at this time.  Therefore, I will

12  make a finding, a declaratory judgment that Serv Trust is a,

13  the alter ego of the, of Mr. Myers in this case; and as such,

14  the matter is stayed as to this litigation going forward at

15  this time.

16    All right.  Let me ask counsel if you can prepare a

17  proposed order of declaration for the Court?

18    MR. VERSTANDIG:  Thank you, Honor.  We may email it

19  to chambers, I assume?

20    THE COURT:  Sure and send it to Mr. Myers, too --

21    MR. VERSTANDIG:  Yes.

22    THE COURT:  -- for his view.

23    MR. VERSTANDIG:  Thank you.  Should we do so prior to

24  emailing it to chambers --

25    THE COURT:  Yeah, why don't we just do that?  Just,

142

1   well, just mail it to Mr. Myers with chambers.

2             MR. VERSTANDIG:  Okay.  Thank you.  We will cc him on

3   the --

4             THE COURT:  All right.

5             MR. VERSTANDIG:  -- chambers.

6             THE COURT:  Is there, is there any clarification of

7   my ruling that you need?

8             MR. VERSTANDIG:  I appreciate your ruling.  Thank

9   you, Your Honor.

10            THE COURT:  All right.  Anybody?

11            MR. PELLETIER:  Well, I'm here, Your Honor --

12            MR. MYERS:  Well, I do --

13            MR. PELLETIER:  -- this is Eric Pelletier for 6789

14  Goldsboro Road.

15            THE COURT:  Okay.  And just --

16            MR. MASTRO:  Nothing, Your Honor, other than just to

17  note for the record that the trustee didn't file an opposition

18  to Mr. Myers' motion to dismiss for lack of subject matter

19  jurisdiction and that's in the record as well.

20            THE COURT:  Okay.  All right.  All right.  Great.

21  Thank you all very much.

22            MR. PELLETIER:  Thank you, Your Honor.

23            MR. VERSTANDIG:  Thank you, Your Honor.

24            THE COURT:  Have a good day.  Oh, based on that, like

25  I said, I abstain the rest of the other, other matters.

143

1              MR. VERSTANDIG:  Yes, Your Honor.

2              THE COURT:  Oka.

3              THE BAILIFF:  All rise.

4              THE CLERK:  The Court stands in recess.

5              (The proceedings were concluded.)

144

Digitally signed by Tanja G. Gish

## DIGITALLY SIGNED CERTIFICATE

**eScribers, LLC.** hereby certifies that the attached pages represent an accurate transcript of the electronic sound recording of the proceedings in the Circuit Court for Montgomery County in the matter of:

Civil No. 436977V

BRIAN KING, ET AL.

v.

SERV TRUST, ET AL.

By:

TANJA G. GISH
Transcriber